No. 42,068

THE STATE OF KANSAS, *Appellee*, v. RICHARD EUGENE HICKOCK and PERRY EDWARD SMITH, *Appellants*.

(863 P. 2d 541)

Opinion filed July 8, 1961.

*Dale H. Corley*, of Garden City, argued the cause and was on the briefs for defendant Richard Eugene Hickock.

*A. M. Fleming*, of Garden City, argued the cause and was on the briefs for defendant Perry Edward Smith.

*Robert E. Hoffman*, Assistant Attorney General, and *Duane E. West*, of Garden City, Special Counsel, argued the cause, and *William M. Ferguson*, Attorney General, was with them on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: This is a joint appeal by two defendants who were jointly charged, tried, convicted and sentenced for four separate crimes of murder in the first degree (G. S. 1949, 21-401).

The events giving rise to the criminal prosecution in question, the proceedings had therein prior to and during the trial, the result of the trial, and post trial matters leading up to perfection of the instant appeal, all of which are incontrovertible, are essential to a proper understanding of the appellate issues involved. Therefore those matters, as established by the record, will be detailed at the outset.

At approximately 1 o'clock a. m. on November 15, 1959, Herbert Wesley Clutter, a prominent resident of Finney County, Kansas, his wife Bonnie Mae Clutter, his daughter Nancy Mae Clutter, sixteen years of age and his son Kenyon Neal Clutter, fourteen years of age, were brutally murdered in their farm home near Holcomb, Kansas, which is approximately seven miles west of Garden City, the county seat.

On December 30, 1959, defendants Richard Eugene Hickock and Perry Edward Smith were arrested at Las Vegas, Nevada. Subsequently, and on January 6, 1960, they were returned to Garden City by officers of the Kansas Bureau of Investigation where they had been charged jointly with four counts of first degree murder by a complaint filed by the County Attorney of Finney County.

The day after their return the defendants were brought before the judge of the county court of Finney County, where they were afforded an opportunity to request and have a preliminary hearing on the charges set out in the warrant issued on the complaint. At that time both defendants waived preliminary hearing and thereupon were bound over to the district court of Finney County for trial.

On January 8, 1960, both defendants were brought before the district court where Harrison Smith and A. M. Fleming, both experienced, qualified, competent and respected members of the Kansas Bar, were appointed to represent defendants Hickock and Smith, respectively. At that time the clerk of the district court delivered certified copies of the information, which had been filed against the defendants on that day and charged them jointly with four counts of first degree murder, to each defendant and to their attorneys.

On January 29, 1960, the defendants both filed motions requesting the court to appoint a commission to examine the defendants to determine whether their mental status was such they could legally be tried (G. S. 1949, 62-1531) and to determine their sanity at the time of the commission of the alleged crime (G. S. 1949, 62-1532). After argument both motions were sustained insofar as they requested the appointment of a commission, under the provisions of 62-1531, *supra*, to determine whether the defendants were insane, imbeciles or idiots, and unable to comprehend their positions and aid in their defense.

Following action as indicated the court appointed John O. Austin, M. D., R. J. Maxfield, M. D., and Gust H. Nelson, M. D., all of whom are conceded to be reputable, qualified, experienced and respected practicing physicians and surgeons of Finney County, to act as a commission to examine each defendant. Thereafter, in conformity with G. S. 1949, 62-1531, this commission examined the defendants and filed separate reports with the court stating, in substance, that after having examined the defendants it found each defendant was not insane, an idiot or an imbecile, and that each such defendant was able to comprehend his position and to make his defense.

On February 9, 1960, the defendants accompanied by their respective attorneys were brought before the court and, upon arraignment, each defendant chose to stand mute, whereupon the court entered pleas of not guilty on behalf of each defendant on each of such counts. Thereupon, it having been previously indicated that separate trials were desired, the court announced both cases would be set for trial by jury in the district court of Finney County on March 22, 1960, at 10 a. m., and that the court would proceed, at the request of the state, with the trial of Perry Edward Smith first.

On February 25, 1960, the state filed a motion asking permission to endorse the names of additional witnesses upon the information. The record discloses no objection to this motion and it was sustained.

On March 1, 1960, each defendant filed a motion to quash the jury panel on grounds of irregularities in the selection of such panel. This motion was heard and sustained by the court on March 2. Thereafter, and on the same date, it proceeded to name a new jury panel under G. S. 1949, 43-128.

On March 4, 1960, the state filed its motion for permission to cor-

rect names incorrectly listed in the information. On presentation of this motion on March 9 counsel for each of the defendants announced they had no legal objection to the granting of such motion, whereupon it was sustained.

On March 14, 1960, Hickock filed a motion for continuance upon the grounds that Walter S. Hickock, his father, was ill and could not testify. Upon a hearing, and after pointing out it appeared the condition of the witness in question was such his testimony could be taken by deposition or that he might be able to personally appear at the trial, the court denied this motion.

Early in the proceeding Hickock had demanded a separate trial. Later, and on March 9, 1960, after the endorsement of additional witnesses on the information by the state, including both defendants, he announced in open court that, after consultation with his counsel, it was his desire to be tried with his co-defendant Smith. The court then inquired of Smith if that was his desire also and received an affirmative answer. Thereupon the court announced in substance that in conformity with the desires of the defendants there would be a joint trial, which would commence on March 22, 1960.

On the date last above indicated the case was called for trial. Each defendant and the state announced ready for trial. The court then announced that the trial was apt to be a protracted one and that it deemed it advisable to select two alternate jurors, in addition to a jury of twelve men. No objection being made to this suggestion jurors were interrogated until twelve men had been selected as satisfactory to the parties to try the cause, without either the defendants or the state having exhausted the peremptory challenges, allowed by statute (G. S. 1949, 62-1402 and 62-1403). The court then asked the state and each defendant if they desired to waive further peremptory challenges and received an affirmative answer from all such parties. Thereupon the jury of twelve men, then in the jury box, was duly empaneled and sworn to try the cause. Thereafter the alternate jurors were examined and two were selected by the parties as satisfactory. The court then inquired if the parties desired to waive their peremptory challenges to the alternate jurors and, having received affirmative answers, the two jurors so selected were sworn to act as alternate jurors in the event their services were required.

Following the empaneling of the jury, the state proceeded to make its opening statement. Each defendant then elected to re-

serve the right to make an opening statement until after the state had presented its evidence. The state then adduced its evidence and rested. Thereafter defendants' counsel made their opening statements and evidence was adduced on behalf of each such defendant. Neither defendant testified in his own behalf.

At the close of all evidence the court gave the jury full and complete written instructions, to which no objections were made, and, after closing arguments, directed it to proceed, in charge of a sworn bailiff, to the jury room to consider its verdicts. In due course the jury returned separate verdicts finding each defendant guilty of murder in the first degree on all of the four counts charged in the information and, under the provisions of G. S. 1949, 21-403, fixed the punishment for each defendant on each count at death.

Following the return of the verdicts each defendant filed a motion for a new trial. No affidavits or testimony were offered in support of these motions and they were heard and overruled. Thereafter the trial court approved the verdicts and each defendant was sentenced to be hanged. Thereupon the defendants jointly perfected the instant appeal and this court, pursuant to their joint application, issued an order staying execution of their respective sentences (G. S. 1949, 62-2414) pending its determination.

With what has been heretofore related all that is required to round out the factual picture, necessary to insure a full and complete understanding of the issues raised on appeal, is a highly summarized statement of the evidence adduced by the state, all of which may be said to have been wholly uncontroverted and undisputed by any other evidence of record to the contrary. Omitting many of their gruesome details and cumulative features, the facts established by such evidence may be stated thus:

While serving time in the Kansas State Penitentiary on another sentence defendant Hickock celled with an inmate who had worked for Herbert Wesley Clutter and got the impression from such cellmate that Clutter was a wealthy wheat farmer, who kept a safe in his home, located near Holcomb, Kansas, containing large sums of money. Hickock devised a plan whereby he and a friend would, upon his being discharged from the penitentiary, go to Holcomb, tie the Clutter family up, rob the safe and leave no witnesses to the crime.

Sometime after being released from the penitentiary, Hickock wrote to defendant Smith, then in Nevada, telling him he had a "score." On November 12, 1959, Smith came to Kansas and called

Hickock who was working in a body shop at Olathe. The two men did some work on Hickock's 1949 Chevrolet automobile. Then on Saturday afternoon, November 14, they left Hickock's home at Edgerton, Kansas, for Holcomb. They told Hickock's parents they were going to Fort Scott to see Smith's sister, who actually lived in California.

Enroute to the Clutter farm the two men stopped and purchased nylon rope, two inch adhesive tape, a small pocket knife, and some rubber gloves.

About midnight the defendants arrived in Garden City where they stopped at a filling station to buy gas. They then drove to Holcomb and up a lane leading to the Clutter residence, which was about one-half mile west of the south edge of that town. After reaching that point they noticed a light in the tenant house, to the southwest of the main residence, and started to leave. However, the light in the tenant house went out before they were half way out of the drive, so they turned around and went back, parking their car in the drive on the west side of the Clutter home.

Upon leaving Edgerton, Hickock had placed his twelve gauge shotgun and his eight inch blade hunting knife in the car, together with a box of shells and a hunting vest.

Soon after they parked in the drive defendants entered the Clutter residence through the unlocked west door of that building, taking the shotgun and hunting knife with them. They then got Mr. Clutter out of his bed in the downstairs bedroom, took him into a room used for an office, and searched for the safe. Failing to find one they interrogated him about its location. Upon being told there was no safe, they obtained some money from Mr. Clutter's billfold. Then they took him upstairs where Mrs. Clutter, Nancy and Kenyon were sleeping. After arousing the three persons mentioned, they put all the members of the family in the second floor bathroom and then searched the house for the safe and more money. They found some money but no safe. Mr. Clutter was then taken to the basement and tied hand and foot on a mattress carton in the furnace room. Kenyon was then taken to the furnace room and tied to a soil pipe on the north wall near his father. Mrs. Clutter was then tied hand and foot to her bed and Nancy was tied hand and foot in her bed. Then the defendants decided to tape the family. Mrs. Clutter was taped first but Nancy was by-passed. Kenyon was then cut loose from the soil pipe and tied to a couch

in the southwest corner of the recreation room, south of the furnace room. Then the defendants taped Kenyon and his father.

Then, desiring to leave no witnesses, Mr. Clutter's throat was cut, and, as a so-called act of mercy, he was shot in the head. Next Kenyon was killed by a blast from the shotgun at close range. The defendants then went from the basement to the second floor where Nancy and her mother, in that order, were shot with the shotgun and killed. In each instance, the defendants picked up the empty shell casing as it was ejected from the shotgun after having fired its lethal load.

Upon leaving the scene, the defendants took a portable transistor radio belonging to Kenyon and a pair of binoculars. All told they had been at the Clutter residence approximately one hour.

The defendants then drove back to Garden City where they turned north on U. S. 83. At the county line they observed the lights of the Century Refinery and, in order to avoid what they thought was Scott City, turned east on the county line road. After going a short distance, they stopped, got out of the car, and while Hickock cleaned the victims' blood from the shotgun with the water drained from the car radiator, Smith dug a hole with the hunting knife and buried the four expended cartridges and the unused rope and tape left over from tying and taping the members of the Clutter family.

The defendants then drove east toward Edgerton. Along the way they stopped at a roadside park and burned some of their blood-stained clothing, including the gloves they had worn at the Clutter home. They reached Olathe about 11 a. m. Sunday morning, November 15, 1959, where Smith registered at a hotel under an assumed name and Hickock went on to his parent's home at Edgerton.

Several days later the defendants left the Kansas City area and drove directly to Mexico City where they sold Hickock's car and the radio and binoculars, the two latter items to a traffic policeman. They then went to California; back to Iowa; back to Kansas City, and then to Las Vegas, Nevada, where, on December 30, 1959, they were arrested. Subsequently they were brought back to Garden City where they had been charged with murdering the four members of the Clutter family.

On dates not here important but which may be stated to have been between the date on which the members of the Clutter family were killed and the date of the commencement of the trial, officers

of the Kansas Bureau of Investigation and members of the Finney County Sheriff's force recovered Hickock's hunting knife and the twelve gauge shotgun, used in the killing, at the home of Hickock's parents in Edgerton; the radio and binoculars from the officer to whom they had been sold in Mexico City; and the articles consisting of tape, unused nylon rope, and the four expended shotgun cartridges, which the defendants had buried on the county line road north of Garden City. These items, it is to be noted, were all recovered as the result of information furnished the Kansas officers by the defendants at Las Vegas, Nevada, or while they were being returned to Kansas.

In leaving the state's evidence it should be noted that, except for the first and last paragraphs of what has been set forth in the foregoing evidentiary statement, the major portion of the facts heretofore referred to as established by such evidence came from the lips of witnesses, who, in the main, based their testimony with respect thereto upon voluntary statements and admissions made to them by the defendants themselves, to which evidence the defendants made no objection when it was offered and admitted as a part of the state's case in chief. Indeed, it may be stated that in this appeal no contention is made that any of the evidence, relating to statements and admissions made by the defendants with respect to the facts previously detailed, was erroneously admitted.

Counsel for the defendants have been diligent in advancing claims of error. From the record presented it appears that a number of such claims were not brought to the attention of the trial court on the hearing of their motions for a new trial and others are not included in their specifications of error. Nevertheless, in accord with its fixed policy in appeals involving capital punishment (see *State v. Andrews,* 187 Kan. 458, 459, 357 P. 2d 739; *State v. Lammers,* 171 Kan. 668, 672, 237 P. 2d 410), this court will examine all claims advanced by counsel with meticulous care for the purpose of determining whether they disclose any possible error prejudicial to the rights of the defendants.

At the outset it may be stated that claims of error made in this case can be divided into three classes, (1) those common to both defendants; (2) those relied on solely by Smith; and (3) those relied on solely by Hickock, and will be considered in that order.

Defendants' first complaint is that the trial court erred in refusing to appoint a psychiatrist to the commission which examined them

under G. S. 1949, 62-1531. Without laboring this point it may be said it has been determined by this court adversely to defendants' position in well considered decisions to which we adhere. See *State v. Lammers,* supra, where, with direct reference to the statute in question, it is held:

". . . the statute does not require that any other than doctors of ordinary medicine be on the commission; . . ." (Syl. ¶ 1.)

And in the opinion (pp. 671 to 677, incl.), after an exhaustive review of our decisions and statutes, said:

". . . The provision in G. S. 1949, 62-1531, that the inquiry may be made by a commission does not require that the members of the commission should have any qualification other than that of a qualified doctor, nor is there any constitutional provision for such." (p. 677.)

For another decision, citing the *Lammers* case and quoting therefrom with approval, see *State v. Martin,* 175 Kan. 373, 390, 265 P. 2d 297.

In connection with the above claim it is suggested that, because defendants' motions for the appointment of a commission included a request the court appoint a commission under the provisions of G. S. 1949, 62-1532, to determine their sanity at the time of the commission of the alleged crimes, the trial court should have appointed a commission for that purpose under the provisions of such statute. This suggestion lacks merit and cannot be upheld. Defendants wholly misconstrue the force and effect to be given the provisions of 62-1532, *supra.* This court has repeatedly held that, in Kansas, the question of the sanity of an accused, at the time of the alleged commission of the offense, is to-be determined by the jury, upon the evidence introduced bearing upon such issue, and not by a commission. (See *State v. Andrews,* 458, 463, supra; *State v. McBride,* 170 Kan. 377, 381, 226 P. 2d 246; *State v. Eye,* 161 Kan. 69 [Syl. ¶ 4], 166 P. 2d 572.)

It is urged that defendants were temporarily insane at the time of the commission of the crime in question and for that reason should not have been found guilty by the jury. We find no evidence of record supporting this claim and the utmost that can be said of defendants' contentions with respect thereto is that a psychiatrist, testifying in their behalf during the trial, stated that in his opinion Hickock knew right from wrong at the time of the commission of the crimes and that he had no opinion on that subject as far as Smith was concerned. In any event, the very most that can be said

for defendants' position on this point is that the question of their sanity at the time of the commission of the crimes was determined by the jury upon the evidence introduced bearing upon such issue. Therefore, under the decisions to which we have last above referred, and see, also, *State v. Mendzlewski*, 180 Kan. 11, 13, 14, 299 P. 2d 598, this claim affords no sound basis for reversal of the judgments.

Defendants contend that the trial court erred in overruling Hickock's motion, of March 14, 1960, for a continuance, heretofore mentioned. This claim is premised upon the proposition that during the presentation of such motion the trial court's attention was called to the fact that by happenstance the farm sale of the property of the Clutter estate had been advertised and was to be held on March 21, 1960, the day before the trial was to commence, and it was suggested that fact might deprive defendants of a fair trial. After hearing arguments on that question, and the specific ground on which the motion for continuance was initially based, *i. e.*, inability of Hickock's father to appear as a witness at the trial because of illness, the trial court overruled the motion. No claim of error with respect to this ruling was made by the defendants on the hearing of their motions for a new trial and, aside from a suggestion the overruling thereof might have been prejudicial to them for the reasons suggested at the hearing on the motions, no showing is here made that they were prejudiced by that action. Under the foregoing circumstances there are at least two reasons why this phase of the trial court's ruling did not constitute reversible error. First, it is a long standing rule of this court that, in a criminal action, alleged trial errors not heard and presented on the hearing of a motion for a new trial are unavailing on appeal. (See, e. g., *State v. Haught*, 180 Kan. 96, 100, 299 P. 2d 573, and cases there cited.) And second, it has been held many times, and is well-established in this jurisdiction, that the matter of a continuance in a criminal prosecution is largely within the discretion of the trial court and that its ruling thereon will not be disturbed unless it has been made to appear that such discretion has been abused to the prejudice of substantial rights of a defendant. (*State v. Smith*, 173 Kan. 807, 812, 252 P. 2d 917; *State v. Morrow*, 179 Kan. 63, 292 P. 2d 1094, and decisions there cited; *State v. Stubbs*, 186 Kan. 266, 271, 349 P. 2d 936, and decisions there cited.)

Hickock's separate claim of error, to the effect the motion should have been sustained on the ground on which it was initially based, is wholly fallacious and cannot be upheld. The record discloses his

father appeared at the trial and testified as a witness in his behalf. In that situation this phase of his claim of error with respect to the ruling on the motion falls squarely within the rule of the decisions last cited.

Defendants also contend that they did not receive a fair trial due to the "most expeditious way" in which they were brought to trial (1) because of the manner in which pre and post trial motions were heard and (2) that their counsel did not have adequate time in which to prepare their defense. The answer to point (1) of the contention is to be found in the record which discloses that no question was ever raised, or complaint made, by the defendants throughout the entire case with respect to the manner in which pre and post trial motions were presented to, and heard by, the trial court. The answer to point (2) of the same contention appears in our statute (G. S. 1949, 62-1301) and our decisions construing its force and effect. See, e. g., *State v. Rangel*, 169 Kan. 194, 217 P. 2d 1063, where it is said:

". . . The defendant was in custody at that term, at which the information was filed, and under the statutes the court was required to try the case unless cause for continuance was shown (*State v. Asbell*, 57 Kan. 398, 46 Pac. 770; *State v. Lund*, 49 Kan. 580, 31 Pac. 146; *In re Garner*, 134 Kan. 410, 5 P. 2d 821)." (p. 197.)

It should perhaps be added that the rule announced in the *Rangel* case is particularly applicable where—as here—defendants in criminal cases are confined in jail without bond and the record makes it clearly appear no request for a continuance, because of lack of adequate time in which to prepare a defense, was ever presented to the trial court prior to the commencement of the trial of the case.

Another contention is that the trial court erred in not granting defendants a change of venue notwithstanding, as is conceded, they made no application for such relief. We do not agree. This contention has been passed upon and determined by our court in decisions, to which we adhere. See *In re Hedrick Appeals*, 155 Kan. 165, 123 P. 2d 806, where it is held:

"The only statutes of our state authorizing a change of venue in a criminal action, on account of prejudice of inhabitants of a county, or judicial district, and providing the procedure therefor, are G. S. 1935, 62-1318 to 62-1321, inclusive." (Syl. ¶ 3.)

And in the opinion said:

"These statutes [referring to 62-1318 to 62-1321, incl., *supra*] present a definite outline of procedure to be followed in determining whether or not the minds of the inhabitants of a county or district are so prejudiced against de-

fendant that a fair trial cannot be had. It must be done upon the 'application of the defendant.' ( 62-1320. ) The petition for the change 'shall set forth the facts upon which the application is made.' Notice must be given to the county attorney, who may resist the application, and the hearing is to be before the court upon affidavit to determine the facts alleged in the application. ( 62-1321.) That is the only way provided by statute for determining whether the minds of the inhabitants of the county are so prejudiced against defendant that he cannot have a fair trial. It has been the method followed throughout the history of our state, as the following list of cases, not intended to be complete, shows: (citing decisions)." (p. 174.)

Finally the defendants contend that due to the magnitude of the crimes and the sensational aspects of the brutal slayings of which they were found guilty, and the intense coverage of the crimes and the case by the press, radio and television, they did not receive a fair and impartial trial in Finney County. These claims, it should be pointed out, were not presented to, or heard by, the trial court on the hearing of the motions for a new trial, and are made for the first time in this court on the basis of contentions which, when boiled down, are based on bare assertions by the defendants' counsel that, under such circumstances, it was impossible for defendants to have a fair trial in the county wherein the crimes were committed. With the record, as indicated, this claim could be disposed of on the basis of the universal rule announced in *State v. Haught*, supra. See, also, *State v. Stubbs*, 266, 271, supra, where it was held that a similar claim, not presented to the court below, could not be considered on appeal. Even so, we are not adverse to discussing the merits of this question briefly.

No reasonable person can seriously contend that, standing alone, the magnitude of crimes of murder and the sensational aspects of brutal slayings in connection therewith deprive the defendant and/or defendants in a criminal action of a fair and impartial trial. We therefore turn, without further comment, to the second phase of this claim.

Conceding that the crimes in question received extended and intense local, state and nation-wide coverage by all news media known to this modern era, it does not follow as a matter of law that defendants were thereby deprived of a fair and impartial trial. That question, as we understand it, must be determined by the particular facts of record. With that in mind, we have obtained and carefully reviewed the transcript of the record. Resort thereto fails to disclose defendants, at any time prior to or during the trial,

made any claim or showing whatsoever that they were being deprived of a fair and impartial trial by the news media now complained of. Nor did they make any such claim or showing in connection with a hearing on their motions for a new trial. Indeed, as we have previously pointed out, their claims to that effect in this court are based on bare assertions unsupported by evidence of record. Moreover, the record discloses the defendants made no application for a change of venue to another county, as authorized by G. S. 1949, 62-1318, or to another judicial district, as permitted by G. S. 1949, 62-1319, on account of inability to receive a fair and impartial trial by reason of prejudice resulting from the news media in question, or for any other reason. The same source reveals they did not move for a mistrial because of prejudice resulting to them during the trial for any reason. In addition, since the record makes it affirmatively appear that defendants waived some of their peremptory challenges, at the time the jury was selected, we must assume that, in the selection of the jury, empaneled and sworn to try the cause, they were able to obtain fair and impartial jurors who were not biased or prejudiced by reason of the news media complained of. Under these circumstances, others previously referred to in the opinion, and others gleaned from a careful reading of the entire transcript of the record, we are convinced, and therefore hold, defendants' position on the claim now under consideration lacks merit and cannot be upheld.

Turning to contentions relied on solely by Smith it is pointed out that the court instructed the jury to "bring in a verdict that speaks the truth" and that one inflicting the death penalty does not conform with the court's instructions "to speak the truth." Arguments advanced on this contention are almost frivolous and require little attention. Their import, as we understand them, is twofold. First, it is claimed that after finding defendants guilty of murder in the first degree the jury had no right to determine whether the death penalty or life imprisonment should be inflicted, as prescribed by statute (G. S. 1949, 21-403). Following *State v. Christensen*, 166 Kan. 152 (Syl. ¶ 1), 199 P. 2d 475, we hold that it was not only its right but its duty to do so. Second, defendants attempt to challenge the wisdom of the death penalty. That question has also been determined. See *State v. Andrews*, supra, where it is said:

"Another facet of the jurisdiction of this court will be noted before turning to the merits of this appeal. In a similar case, *State v. Miller*, 165 Kan. 228, 194 P. 2d 498, the late Mr. Chief Justice Harvey said:

"'We are neither authorized nor have we any disposition to debate the question of the wisdom of capital punishment. The legislature determines the policy of the state in that regard and enacts statutes which the courts are bound to follow. The trial court followed the statute in this case.' (p. 239)." (p. 459.)

See, also, *State v. Wilson*, 188 Kan. 67, 68, 360 P. 2d 1092.

In two other contentions Smith complains of the court's action in sustaining objections to evidence offered by him during the trial of the case. We have examined the rulings and concluded the trial court's action in sustaining the objections were proper. However, contentions with respect thereto should not be labored. The evidence rejected was not brought into the record on the hearing of a motion for a new trial. In that situation such rulings are not subject to appellate review. See *State v. Beam*, 175 Kan. 814, 267 P. 2d 509, which holds:

"Following *The State v. Ball*, 110 Kan. 428, 204 Pac. 701, and other decisions mentioned in the opinion, the rule, that errors assigned respecting the exclusion of evidence not brought into the record on the hearing of a motion for new trial in compliance with the provisions of the criminal and civil codes (G. S. 1949, 62-1414 and 60-3001 to 3004) are not subject to appellate review, is recognized, adhered to and applied." (Syl. ¶ 4.)

In two contentions Hickock contends the court erred in sustaining the state's objection to the testimony of two witnesses, naming them. It is neither necessary nor required that we labor these contentions. Hickock also failed to bring this excluded evidence into the record on the hearing of his motion for a new trial, hence under the rule in *State v. Beam*, supra, to which we adhere, such rulings are not subject to appellate review.

We have now carefully considered and discussed in seriation every reasonable question advanced by defendants in their briefs as grounds for reversal of the judgments rendered against them and found that not one of them warrants or permits a reversal of such judgments. Moreover, and after reading the entire transcript of the record, as well as the abstracts of the respective parties, we fail to find any "plain error," whether specified or not, which would justify or require their reversal. Therefore based on what has been heretofore stated and held it is our duty and obligation to affirm the judgments rendered by the trial court against each of the defendants in conformity with the verdict of the jury.

It is so ordered.