Richard Eugene HICKOCK, Petitioner,

v.

Sherman H. CROUSE, Warden, Kansas State Penitentiary, Respondent.

Perry Edward SMITH, Petitioner,

v.

Sherman H. CROUSE, Warden, Kansas State Penitentiary, Respondent.

Nos. 7605, 7606.

United States Court of Appeals Tenth Circuit.

July 1, 1964.

96

Joseph P. Jenkins, Kansas City, Kan., for petitioner Richard Eugene Hickock.

Robert H. Bingham, Kansas City, Kan., for petitioner Perry Edward Smith.

J. Richard Foth, Asst. Atty. Gen., Topeka, Kan. (William .M. Ferguson, Atty. Gen., and Robert J. Lewis, Jr., Asst. Atty. Gen., Topeka, Kan., on the brief), for respondent.

Before PICKETT, LEWIS and SETH, Circuit Judges.

PICKETT, Circuit Judge.

Richard Eugene Hickock and Perry Edward Smith were convicted of murder in the first degree in the District Court of Finney County, Kansas, and sentenced to death. The conviction was affirmed by the Supreme Court of Kansas. State v. Hickock and Smith, 188 Kan. 473, 363 P.2d 541, appeal dismissed Smith v. State, 373 U.S. 544, 83 S.Ct. 1545, 10 L.Ed.2d 688. Thereafter, while a petition for rehearing was pending, the Kansas Supreme Court, apparently concerned about matters which could not be properly considered on appeal, designated an attorney to bring habeas corpus proceedings in that court to test the validity of the conviction.[1] Such a petition was filed and a writ denied after a thorough examination and full hearing. Hickock and Smith then instituted separate habeas corpus proceedings in the United States District Court for the District of Kansas. These actions were consolidated for hearing and the present appeals are from judgments denying the petitions and remanding the prisoners to the custody of the respondent warden for the execution of the sentences.

The primary questions presented here relate to the contention that the

1. The court appointed Russell Shultz, a prominent Kansas attorney, who was chairman of a special committee appointed by the Kansas State Bar Association to investigate and report on the conduct of the trial of the petitioners. The Hon. Walter G. Thiele, former Chief Justice of the Kansas Supreme Court acted as a commissioner to take evidence in the habeas corpus case. The commissioner filed his report, which contained findings of fact and conclusions of law. The report found that the petitioners had received a fair and impartial trial. The report was adopted by and included in the opinion of the Kansas Supreme Court. Hickock v. Hand, 190 Kan. 224, 373 P.2d 206, cert. denied Hickock v. Crouse, 372 U.S. 924, 83 S.Ct. 741, 9 L.Ed.2d 728.

representation given the petitioners by court-appointed attorneys did not meet the standard of adequacy of representation which would result in a trial having the fundamental fairness required by the Constitution of the United States. After a review of the voluminous record, which includes transcripts of the trial and the habeas corpus cases before the Supreme Court of Kansas, we are of the opinion that the petitioners were not denied the constitutional protection of a fair and impartial trial.

A summary of the facts prior to and during the trial of the petitioners is necessary for a proper disposition of these petitions. A more detailed description may be found in the opinions of the Supreme Court of Kansas in the cases cited hereinabove. During the morning of November 15, 1959, Herbert W. Clutter, his wife, and two teen-age children were found murdered in their farm home about seven miles from Garden City, Kansas. When the bodies were found they were all bound hand and foot and some of the victims had their mouths taped. All had been killed several hours previously by blasts from a shotgun fired into their heads at close range. Hickock and Smith became suspects when investigating officers learned that an inmate of the Kansas State Penitentiary had told his cellmate, Hickock, that he was a former employee at the Clutter farm in western Kansas and that Mr. Clutter kept large sums of money in a safe at the farm home. Shortly before his release on parole Hickock also received from his cellmate information as to the location of the Clutter farm, and a detailed diagram of the interior of the house. When the suspects could not be found, their arrest was requested as parole violators.[2]

On December 30, 1959, after their return from a trip to Mexico City, the petitioners were arrested as parole violators by local police in Las Vegas, Nevada, and executed waivers of extradition to Kansas. Four Kansas officers arrived in Las Vegas on December 31. During the afternoon of January 2, 1960, two of these officers questioned Hickock and two questioned Smith. Hickock was asked concerning his whereabouts and activities from the time of his release from the penitentiary. At the close of a four-hour session the Clutter murder was mentioned, and he denied any knowledge of that crime. The petitioner Smith gave no information. Prior to the questioning, each petitioner was fully advised of his rights, including the right of representation by counsel, and told that any statements which they made could be used against them in court.[3] On January 3 petitioners were questioned further by the Kansas officers, who again advised petitioners of their rights. Within a short time after the questioning began, Hickock told in detail all the facts relating to the robbery and murder of the Clutter family. A confession, written in longhand by one of the officers, was read by Hickock and in addition to his signature, he added, in his own handwriting, that he had read the confession and that it was correct. Smith continued to deny that he had any part in the crime, even though he had been told that Hickock had confessed and implicated him.

2. Hickock and Smith became acquainted in the Kansas penitentiary, and had been cellmates for about a month prior to Smith's parole in July, 1959. Hickock was paroled sometime later.

3. Typical of the warning given to the petitioners by the officers is the testimony of officer Harold R. Nye, agent of the Kansas Bureau of Investigation:
"Q. On that particular day, January 3rd, did you advise the defendant prior to talking to him that he was entitled to consult with counsel? A. I did.

"Q. Did you advise him any statements which he made to you could be used against him in court? A. I did.
"Q. Did you make him any promises of reward or immunity? A. No, sir, I did not.
"Q. For any statements which he might make? A. No, sir.
"Q. Were there any threats of violence or duress used on this defendant at any time during your interrogations? A. No, sir.
"Q. That day or any other? A. At no time."

On January 4 the Kansas officers left Las Vegas by automobile to return the prisoners to Kansas. Smith was riding in one automobile with two officers and Hickock was traveling in the other automobile with two officers. During the trip Smith admitted his part in the robbery and murders and gave a full account of how the crimes had been accomplished. There is no indication in the record of the state court proceedings that the confessions were other than voluntary.[4] Before arrival in Garden City, the officers, at the direction of Smith and Hickock, proceeded to a point near Scott City, Kansas, where they were told that shotgun shells, rope and tape had been buried by petitioners after the commission of the crimes. The petitioners were taken to the county jail in Garden City, arriving there on the evening of January 6. Later, four empty shotgun shells, along with a quantity of rope and tape similar to that used to bind and gag the victims, were found at the designated location. The newspapers and other news media had carried accounts of the arrests in Las Vegas, the subsequent confessions of the petitioners, and the date the officers were expected to arrive in Garden City with the prisoners. Upon arrival at the courthouse a crowd estimated by different witnesses to be from 150 to 500 persons, had gathered, including reporters and representatives of radio and television. There were no demonstrations or threats of violence against the petitioners. The crowd was described as orderly and curious. On January 7 petitioners were taken before the county judge for a hearing on the complaint filed against them. They were advised by the judge that they were entitled to a preliminary hearing and to be represented by an attorney. In a previous conversation with the county attorney, they had been told that there was little to be gained from a preliminary hearing, and when questioned by the judge, such hearing was waived.[5] On January 8 petitioners appeared before a district court for arraignment, where they requested that counsel be appointed for them. Harrison Smith, an attorney of 24 years' experience, was appointed to represent Hickock, and A. M. Fleming, an attorney who had been in the general practice of law in western Kansas for about 40 years, was appointed to represent Smith.[6]

On February 9, 1960 the petitioners were arraigned on an information charging them jointly, in four counts, with murder in the first degree. When asked for a plea of guilty or not guilty to each

4. The only evidence in the state court habeas corpus case which indicated that the confessions were not voluntary was the testimony of Smith, who stated: "I felt I was under duress at the time, not under duress of any physical violence but under mental duress." The commissioner found that the confessions were voluntarily made.

5. The county judge carefully explained the charges to the petitioners, the purpose of a preliminary hearing, and their right to be represented by counsel. Hickock responded: "I would like to waive preliminary hearing." Smith stated: "I wish to waive my rights for preliminary hearing." Thereupon they were bound over to the district court for trial.

6. Upon his appointment Mr. Fleming stated:
"Your Honor, please, I realize I am an officer of the Court and if the Court designates me I don't know what kind of a reason would be a justified reason for not serving. I do not desire to serve but I will serve the best I can if the Court sees fit to appoint me." To which the court replied: "Mr. Fleming, the Court understands your feelings and I am aware of them and I know that no one would seek such an appointment. It is the feeling of the Court that a man charged with a crime, and particularly one charged with a capital offense, should be represented by counsel and by an experienced competent man of high professional skill and of professional and personal integrity, and with due feeling towards your feelings, which are those of any man, if you can do it, the Court would appoint you and would be grateful for the service which you would render to the Court." The Kansas Supreme Court described these attorneys as "experienced, qualified, competent and respected members of the Kansas Bar." 363 P.2d 541, 543. The United States District Court for the District of Kansas agreed with this description.

count, the defendants each stated: "I wish to stand mute." The court then entered pleas of not guilty on behalf of each defendant. The case was set for trial on March 22, 1960.

During the first day of the trial a jury was selected and impaneled. No request was made of the court reporter to record these proceedings, and as was customary in the absence of a request, no record was made of the jury paneling proceedings, including the voir dire examination of the prospective jurors. During the course of the trial the confessions of the petitioners were introduced in evidence without objection. This was also true of the introduction of the shotgun and a hunting knife alleged to have been used in the murders, which were obtained at the home of Hickock's parents. Other evidence of the prosecution included that of expert witnesses who testified that four empty shotgun shells found at the location designated by the petitioners had been fired from the Hickock shotgun; that there was human blood on the boots of one of the petitioners; that the boot had characteristics similar to those of a bloody foot print found at the scene; and that blood on the hunting knife was of the same type as one of the murdered persons. Some of this evidence was admitted without objection. There was also introduced sordid photographs of the murdered persons, to which objection was made, but overruled. The defendants did not testify and their defense was limited to a report of a psychiatrist who had examined them, and who stated that Hickock knew right from wrong, but he had no opinion as to Smith. No objections were made to the court's instructions to the jury. A verdict of guilty on each count was returned by the jury, fixing the punishment at death.

After the petitioners had exhausted their remedies in the state court, they wrote the Chief Judge of the United States District Court for the District of Kansas, indicating that they had not received a fair trial, whereupon the court appointed two active practitioners to represent the petitioners in habeas corpus proceedings in the federal court. The attorneys filed and have prosecuted such petitions with commendable vigor. It is quite obvious from the untiring effort expended in support of the petitions and in preparing and presenting this appeal, the present attorneys are convinced that due to local prejudice and pressure the appointed attorneys representing the petitioners prior to and during the trial did little or nothing to protect their rights. As a result, they contend the petitioners did not have a constitutionally fair trial, and in addition, that the defense offered was a reflection upon the integrity of the Kansas bar and courts. We think, however, that these attorneys, diligent as they are, viewing the situation in retrospect, have lost sight of the problems which confronted attorneys Smith and Fleming when they undertook the defense of these petitioners. When they accepted the appointments each petitioner had made a full confession, and they did not then contend, nor did they seriously contend at any time in the state courts, that these confessions were not voluntary. A radio taken from the Clutter home and sold by the petitioners in Mexico City had been recovered, and the attorneys knew of other evidence of their guilt then in the possession of the prosecution. When called upon to plead to the charges against them they stood mute, and it was necessary for the court to enter a plea of not guilty for them. There was no substantial evidence then, and none has been produced since the trial, to substantiate a defense of insanity. The attempt to establish insanity as a defense because of serious injuries in accidents years before, and headaches and occasional fainting spells of Hickock was like grasping at the proverbial straw.[7] The attorneys were faced with

---

7. The attorneys did request the court to order the defendants removed to a state institution at Larned, Kansas, for a psychiatric examination. The court refused this request, but ordered an examination by a panel of 3 doctors as pro-

a situation where outrageous crimes committed on innocent persons had been admitted. Under these circumstances, they would have been justified in advising that petitioners enter pleas of guilty and throw themselves on the mercy of the court. Their only hope was through some turn of fate, the lives of these misguided individuals might be spared.

In all the conferences between the petitioners and their attorneys, and with Hickock's father, the discussion of defense was directed not toward acquittal, but toward the prevention of a sentence of execution. The considered judgment of these attorneys, who had spent their adult lives in this community, and who knew the temper of its people, after consulting with petitioners, who were mature individuals,[8] was that the chance of accomplishing this result was as good in Finney County, Kansas as it would be any other place where the trial might be removed. In addition to other considerations, it was also the judgment of the petitioners and their attorneys after consultation, that such a result could be obtained in a joint trial as readily as in separate trials. The trial court's finding that from the testimony of the attorneys and "from the testimony of the petitioners themselves and from an examination of the trial record itself * * * petitioners and their counsel agreed upon a course of conduct for the trial" is amply supported by the record.

█ The law is well settled that in a proceeding such as this, the only errors of a state court which may be considered are those which deprive an accused of fundamental rights guaranteed by the Constitution of the United States. 28

U.S.C. § 2241; Bizup v. Tinsley, 10 Cir., 316 F.2d 284, and cases cited; Gay v. Graham, 10 Cir., 269 F.2d 482; State of Utah v. Sullivan, 10 Cir., 227 F.2d 511, cert. denied, sub. nom. Braasch v. Utah, 350 U.S. 973, 76 S.Ct. 449, 100 L.Ed. 844; Trujillo v. Tinsley, 10 Cir., 333 F.2d 185. Habeas corpus is not a substitute for appeal. Odell v. Hudspeth, 10 Cir., 189 F.2d 300, and cases cited, cert. denied 342 U.S. 873, 72 S.Ct. 116, 96 L.Ed. 656; Wallace v. Hunter, 10 Cir., 149 F.2d 59; Bizup v. Tinsley, supra; Peterson v. Tinsley, 10 Cir., 331 F.2d 569.

█ While the power of a federal court in a habeas corpus proceeding is great indeed, the narrow limits of its jurisdiction within which that power may be exercised when reviewing a state court conviction cannot be too strongly emphasized. The function of the great writ in such instances " * * * is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations. State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Townsend v. Sain, 372 U.S. 293, 311–312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770. See, also, Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837.

█ Of course, as said in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 722, the right to counsel in criminal cases is a fundamental right guaranteed by the due process clause of the Fourteenth Amendment to the Constitution.[9] This means good-

vided for by Kansas Statute. Kan.Gen. Stat. § 62–1531.

8. At the time Smith was 31 years old and Hickock was 28. Neither was a newcomer to the criminal courts. A reading of the testimony dispels any doubt that they, although not highly educated, were illiterate, ignorant dupes, easily led or influenced by officers, attorneys, or anyone else. They knew their rights from the time of their arrest until conviction.

9. This right does not accrue until an indictment is returned by a grand jury or an information filed formally charging the accused. It does not include representation at a preliminary hearing. State of Utah v. Sullivan, 10 Cir., 227 F.2d 511; Latham v. Crouse and York v. Crouse, 10 Cir., 320 F.2d 120, cert. denied 375 U.S. 959, 84 S.Ct. 449, 11 L.Ed.2d 317.

faith representation, with all the skill which counsel possesses, but it does not contemplate that miracles will be performed or that counsel, court-appointed or otherwise, should be subject to criticism by the courts when a guilty client is convicted and brought to justice, if he has performed his duty to the best of his ability.[10] Counsel's duty in a criminal case is to demand and obtain a fair trial for the accused. Although it may often appear otherwise, he has no duty to use devious means to secure an acquittal of a guilty person or to harass a court with unwarranted objections and motions. What we said in Hester v. United States, 10 Cir., 303 F.2d 47, 49, cert. denied 371 U.S. 847, 83 S.Ct. 80, 9 L.Ed.2d 82, is appropriate here:

"A careful review of the trial proceedings indicates that appellant was adequately represented by trial counsel and that his rights under the Sixth Amendment were not violated. It is true, as present counsel emphasizes, that counsel did not voice a single objection during the course of the trial proceedings. This trial technique may sometimes be indicative of lack of experience but in other circumstances may be the considered practice of the skillful attorney. In the case at bar the prosecution presented a careful and complete case to which appellant apparently had no answer. Neither vigor nor skill can overcome truth. Success is not the test of effective assistance of counsel.

Mitchell v. United States, 104 U.S. App.D.C. 57, 259 F.2d 787." See, also, Floyd E. Johnson v. Crouse, Warden, 10 Cir., 332 F.2d 417.

Petitioners urge that the crimes with which they were charged were so extensively publicized by the news media in Finney County with reference to their confessions and background that it was impossible to secure a fair trial in that county. In other words, they say that they were tried before an opinionated and biased jury, which deprived them of their right to a constitutional trial. The Constitution "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751. The nature of the crimes with which the petitioners were charged were of such magnitude that it attracted newsmen from the entire state of Kansas and elsewhere. The customary flair for headlines was ever present, and at times the conduct of the prosecuting officials was not all that was to be desired. But the record does not sustain the contention that the trial jury was not a fair and impartial one. In the state court habeas corpus proceeding the jury members were called as witnesses and were questioned by counsel for petitioners. Most of the jurymen knew of the Clutter family, some were acquaintances, but there was no close relationship between any of them

10. In Frand v. United States, 10 Cir., 301 F.2d 102, 103, this court said: "Lack of effective assistance of counsel in the trial of a criminal case constitutes impingement upon a constitutional right of the accused and lays the judgment and sentence open to collateral attack by motion under the statute. But the constitutional right to the effective assistance of counsel does not vest in the accused the right to the services of an attorney who meets any specified aptitude test in point of professional skill. And common mistakes of judgment on the part of counsel, common mistakes of strategy, common mistakes of trial tactics, or common errors of policy in the course of a

criminal case do not constitute grounds for collateral attack upon the judgment and sentence by motion under the statute. It is instances in which resulting from the substandard level of the services of the attorney the trial becomes mockery and farcical that the judgment is open to collateral attack on the ground that the accused was deprived of his constitutional right to effective assistance of counsel. Mitchel v. United States, 104 U.S.App. D.C. 57, 259 F.2d 787, certiorari denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86; Black v. United States, 9 Cir., 269 F.2d 38, certiorari denied, 361 U.S. 938, 80 S. Ct. 379, 4 L.Ed.2d 357."

and any member of the Clutter family. All of them had heard of the case and were familiar with the facts through newspapers, television, and radio. Each, however, testified that he had no bias or prejudice for or against the petitioners and undertook to decide the case from the evidence with an open mind and without any fixed opinion. Some of the jurors indicated that they may have had a preconceived notion as to the guilt or innocence of the petitioners, but this does not disqualify the juror if he "can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." Irvin v. Dowd, supra, 366 U.S. at 723, 81 S.Ct. at 1643. Each testified that he could.

 This is not a "Dowd" case, where the accused was denied a change of venue. Here, after weighing all the local conditions, it was determined by the petitioners and their counsel that a change of venue should not be requested.[11] It was concluded that due to these conditions a sympathetic jury was as likely to be found in Finney County as in any other jurisdiction. This choice having been made, petitioners are bound by it, and are not entitled to a second guess. This case appears to be similar to Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed. 2d 98, rehearing denied 370 U.S. 965, 82 S.Ct. 1575, 8 L.Ed.2d 834, in which it was held that the pre-trial publicity was not such that a court would be required to find as a matter of law that the jury panel was biased to such an extent that the court could not believe answers given by prospective jurors when questioned. Petitioners argue that the attorneys were remiss in their duties because they did not strenuously resist the introduction of the confession in evidence, but at the time of trial it appears to be undisputed that all the questioning of the petitioners had been courteous and temperate and the confessions voluntary. Although it is now contended that the confessions were not voluntary and obtained without advice of counsel, upon consideration of the record as a whole, we agree with the findings of the trial court and the Supreme Court of Kansas that the confessions were voluntarily given and their admission in evidence was not a violation of due process as guaranteed by the Fourteenth Amendment to the Constitution. Ashdown v. Utah, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443. In State of Utah v. Sullivan, supra, 227 F.2d at 514, 515, we said:

"But on the trial of a criminal case in a state court the introduction in evidence of a free and voluntary confession made while uncounseled does not create an infirmity under the Fourteenth Amendment which empowers a United States Court to issue its writ of habeas corpus restraining execution of the judgment of the state court. Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522."

We also agree with the trial court that the failure of the attorneys to request the court reporter to record the voir dire examination of the jurors or resist the introduction of articles obtained from Hickock's parents without a search warrant, or the admission in evidence of pictures of the murder victims, did not deprive petitioners of a constitutional trial.

Affirmed.

11. Some of the reasons given for the decision not to request a change of venue were that the local community was highly religious and generally thought to be opposed to capital punishment. The Ministerial Alliance had publicly stated that it was opposed to capital punishment, and the minister of the church to which the Clutter family belonged had delivered a sermon denouncing it. The attorneys, Fleming and Harrison, were long-time residents there and highly respected. Fleming was a former mayor of Garden City.