THE STATE OF KANSAS, *Appellee*, v. JAMES P. FREDERICKSON, *Appellant*.

No. 16,549.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Evidence to Establish Good Character— General Reputation—Limitation.* When the defendant in a criminal action undertakes to establish good character as an element of his defense to the charge he is limited in his proof to testimony regarding his general reputation for possessing the traits involved, in the community where he resides, and the state, in rebuttal, is limited to the same kind of testimony. Neither party may resort to specific instances of conduct demonstrative of character, nor to the private judgment or opinion of individuals, nor to any fact other than that of general reputation.

2. ——— *Rebuttal Testimony of Specific Instances of Conduct Prejudicial.* In this case it is held that certain evidence in rebuttal, admitted in opposition to the rule stated, was prejudicial to the defendant to such an extent that he is entitled to a new trial.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed February 12, 1910. Reversed.

*F. J. Oyler*, and *Baxter D. McClain*, for the appellant.

*Fred S. Jackson*, attorney-general, *S. A. Gard*, and *H. A. Ewing*, county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The appellant was charged with murder and was convicted of manslaughter in the fourth degree. His claim of error is that prejudicial testimony was wrongfully admitted.

At the time of the homicide the appellant was city marshal of the city of Bassett and constable of Iola township, in which Bassett, a city of the third class, is situated. He undertook to arrest William Cooper, a negro, on the charge of carrying concealed weapons, and within a few moments shot Cooper in the back.

No one saw what occurred between the parties before or at the time. the shot was fired. According to the appellant's account of what took place the shooting was apparently necessary to save his own life.

To sustain his defense of self-defense the appellant put in issue his character as an officer and as a man, and to prove good character presented many witnesses who testified favorably regarding his general reputation as a careful, conscientious and faithful officer and as a peaceful, quiet and law-abiding citizen. To rebut this proof the state produced the ex-mayor of Bassett, who testified that while he was mayor the appellant was a member of the police force. When the appellant was sworn in the mayor took his resignation in order to get rid of him at any time his services were not satisfactory. Afterward the mayor presented the resignation to the council, which accepted it; but the appellant refused to leave the force, continued to act as a policeman, wore his uniform and carried his gun. The resignation was presented to the council because the mayor had information which led him to believe the appellant was not a suitable officer and the mayor had no further confidence in him. The state also produced two members of the city council who testified that the appellant was discharged from the police force. The appellant objected to all this testimony and exceptions were duly saved to its admission.

If the appellant bore the character he claimed, his care and conscientiousness as an officer and his instincts as a quiet, peace-loving and law-abiding man would most likely guide him safely through a crisis. The possession of such ingrained characteristics would make it strongly probable that he acted within the law and was guilty of no crime. It was of vital importance, therefore, that he should establish his character before the jury. How could he do so? The method is well understood. The court could not stop to listen to a history of how he behaved on some or on many occa-

sions, or assume to take an accounting of his character either from specific demonstrative acts or the private opinions of individuals. All he could do was to show his general reputation for possessing the qualities in issue, and this general reputation is fair evidence of true character.

"No doubt actual character does not always merit the estimation which reputation puts upon it; but, nevertheless, there is a certain inevitableness in the revelation of character by conduct, and a certain sureness of apprehension even in the rough popular judgment. Confucius said in a warning to his disciples: 'How *can* a man conceal his character!' Emerson expounded it as a cardinal truth of life: 'A man passes for what he is worth. Very idle is all curiosity concerning other people's estimate of us; and all fear of remaining unknown is not less so. The world is full of judgment-days, and into every assembly that a man enters, in every action he attempts, he is gauged and stamped. "What has he done?" is a divine question which searches men, and transpierces every false reputation. A fop may sit in any chair of the world, nor be distinguished for his hour from Homer and Washington; but there need never be any doubt concerning the respective ability of human beings. Human character evermore publishes itself.' " (2 Wig. Ev. § 1610.)

After the appellant had presented his evidence of good character, how could the state disprove it? Logically it might seem that an effective way would be to show specific instances of conduct incompatible with the traits assumed and to take the judgment of responsible persons whose relations with the appellant had been such that they ought to know in fact what his true character really is. Manifestly, however, it would be unfair to a defendant to allow the state to avail itself of a class of testimony to which he is not permitted to resort. Once open the door to specific facts and the court would be overwhelmed with collateral issues, each one as difficult of determination as the truth of the main charge. The same embarrassment would occur if private opinion were to be taken, arising as it frequently

must from personal differences, contests and rivalries and colored by prepossession, prejudice, malice and misunderstanding. Besides this, a defendant might be taken by surprise by fabrications which he would be unable to meet and by semblances which he would be unable to dissipate, all on the instant. Therefore the state should be restricted to the same kind of proof that the party on trial must employ. In harmony with these views the law has been stated by this court as follows:

"When character is in issue, the law limits the inquiry to general character, and not to specific acts; not the estimate of a few, nor the opinion of a part of the community; but it can be shown only by common report, general reputation and opinion generally entertained of the party in the community where he lives." (*The State v. Kirby,* 62 Kan. 436, 445.)

This being true, the testimony recited was erroneously admitted. Was it prejudicial?

The evidence was very damaging. The mayor and councilmen were the persons intrusted by the people with the responsibility of organizing and maintaining an efficient police force in the interest of the public welfare. The mere fact that they discharged the appellant was an indication that he was unfit to be intrusted with the powers and duties of a peace officer. The fact that the mayor, upon information which he possessed, felt called upon to use the resignation he had taken and had no further confidence in the appellant was enough to disparage him. And it was quite unlikely that the appellant could be the kind of man he claimed to be if in defiance of the constituted authorities he usurped an office he was unworthy to hold and paraded himself as a policeman, wearing his uniform and carrying a weapon. It is true the force of the mayor's testimony was somewhat broken by cross-examination, but the incident could scarcely fail to have the effect of embroiling the subject under investigation and of preventing the appellant's evidence from having

its natural and proper weight and influence. Consider-
able testimony was produced to the effect that his repu-
tation was not very good. A few witnesses said it was
bad. But when this testimony was measured up beside
the appellant's proof the jury might well have con-
cluded he possessed the character he claimed. The ap-
pellant's account of the shooting was consistent, reason-
able and probable. He said that on going to Cooper af-
ter he fell Cooper tried to point a pistol, which he had
succeeded in freeing from his clothing, at the appellant,
who wrested the weapon from the man's right hand.
On this point he was disputed by a witness who at least
was not biased in his favor. On the day after the shoot-
ing he had a conversation relating to the occurrence
with Cooper at the hospital. The witnesses to this
conversation divided sharply upon the effect of it. At
the trial Cooper's dying declaration was read, which
indicated the shooting was quite wanton, and which the
jury seems not to have believed. In this state of the
case it may well be that the jury rested its verdict at
the lowest degree of manslaughter instead of acquittal
because of the wrongful breach made in the appellant's
character evidence by the mayor and councilmen who
testified against him. The court is unable to decide that
the result would probably have been the same if the tes-
timony objected to had been excluded.

Construed together, the instructions properly pre-
sented the law to the jury. The judgment of the dis-
trict court is reversed and the cause is remanded for a
new trial.