No. 42,907

THE STATE OF KANSAS, *Appellee,* v. JAMES DOUGLAS LATHAM and GEORGE RONALD YORK, *Appellants.*

(375 P. 2d 788)

Opinion filed November 3, 1962.

*Marvin E. Thompson* and *Richard M. Driscoll,* of Russell, and *Bernard E. Whalen,* of Goodland, argued the cause, and *Jesse I. Linder,* of Sharon Springs, was with them on the briefs for appellants.

*James E. Taylor,* County Attorney, of Sharon Springs, and *Selby S. Soward,* Special Assistant Attorney General, of Goodland, argued the cause, and *William M. Ferguson,* Attorney General, of Topeka, and *A. K. Stavely,* Assistant Attorney General, also of Topeka, were with them on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendants were convicted of murder in the first degree as defined in G. S. 1949, 21-401, and the jury assessed the death penalty pursuant to G. S. 1949, 21-403. Post-trial motions were filed, including a motion for a new trial, which were overruled, and the defendants have appealed.

A chronological statement of the proceedings had is essential to a proper understanding of the questions involved, hence those matters are detailed as follows: The defendants were apprehended and taken into custody by the sheriff and his deputies in Tooele County, Utah, on June 10, 1961. On June 16, 1961, agents of the Kansas Bureau of Investigation returned them to Wallace County, Kansas, where they had been charged jointly on June 12, 1961, with the deliberate and premeditated murder of one Otto Ziegler on June 9, 1961.

Shortly after their return to Kansas and on June 16, 1961, the defendants were taken before the county court of Wallace County for a preliminary examination as provided in G. S. 1949, 62-805. The complaint and warrant, the statutes under which the arrest

was made and on which the complaint and warrant were based, the penalty imposed by statute for murder in the first degree, the purposes of a preliminary examination, that the defendants had the right to employ counsel to represent them at a preliminary hearing and that they could insist the state produce evidence in support of the crime of murder in the first degree as alleged in the complaint and warrant, were all fully explained to them in open court. Being so advised, the defendants executed a written waiver of a preliminary hearing and consented to being bound over to the district court of Wallace County to await trial at the first day of the next regular term of court. As examining magistrate, the judge of the county court found that the offense charged was not a bailable offense under the laws of Kansas.

Thereafter, the judge of the county court determined that the jail of Wallace County was not of sufficient security to guarantee to defendants a place of safekeeping; that Wallace County did not have sufficient facilities to protect the defendants, and that the public safety and welfare required a change of custody. Accordingly, and on the same day, the county court made an order that the defendants be confined in the Kansas State Industrial Reformatory at Hutchinson, Kansas, to await trial.

On July 14, 1961, the county attorney filed a verified information in the district court of Wallace County charging the defendants with the deliberate and premeditated murder of Otto Ziegler in Wallace County on June 9. On July 17, 1961, the deputy warden of the State Reformatory delivered to each defendant personally a certified copy of the information as is required by G. S. 1949, 62-1302.

On July 20, 1961, the defendants were brought before the district court of Wallace County at Sharon Springs, Kansas, for arraignment. The transcript of proceedings discloses that Jesse I. Linder, an able and experienced lawyer practicing law in Sharon Springs, was appointed to represent the defendant James Douglas Latham. Wallace County has but three practicing attorneys, and for good cause, the third practicing attorney of the county declined appointment. Thereupon, Bernard E. Whalen, of Goodland, likewise an able and experienced attorney of Sherman County which is located approximately 30 miles north of Sharon Springs, was appointed to represent George Ronald York. The question of inconvenience of counsel to confer with the defendants in Hutchinson

was raised and the district court stated that while it might be inconvenient for anyone to represent the defendants, any other attorney appointed would of necessity be a nonresident of Wallace County.

After their appointment by the court, counsel conferred with their clients in separate rooms. The county attorney furnished each defendant with copies of all papers on file at that time. After consultation with counsel and in open court, each defendant was arraigned by a reading of the information separately. Each defendant stood mute, and a plea of not guilty was entered by the court for each.

The suggestion of possible insanity was made and the court, at the request of all attorneys, appointed a sanity commission pursuant to G. S. 1949, 62-1531, "to determine whether or not said defendants or either or both of them are insane . . . and unable to comprehend his position and to make his defense." The commission consisted of William Wilks, M. D., of the Larned State Hospital; G. A. Chickering, M. D., and DeMerle E. Eckart, M. D., both of Hutchinson. Dr. Chickering is a psychiatrist.

The district court fixed the time of trial for September 18, the first day of the September 1961 term, and ordered the defendants returned to the State Reformatory.

The court and court appointed counsel discussed the matter of taking depositions outside the state and the court advised counsel they could incur reasonable expenses and would be paid their statutory per diem by Wallace County in taking the depositions and in conferring with the defendants in the State Reformatory.

The sanity commission examined the defendants at Hutchinson, and on August 24, 1961, filed separate reports stating that each defendant "is sane and that he is able to comprehend his position and to make his defense."

On August 10, 1961, York filed a motion for change of venue on the ground that he could not obtain a fair and impartial trial because the minds of the inhabitants and residents of Wallace County were prejudiced against him. A supplemental motion was filed August 31, to which was attached articles appearing in some twenty-one different newspapers.

On August 29, 1961, Latham filed a plea in abatement, a motion for change of venue, a motion for separate trials, a request for addresses and occupations of witnesses endorsed on the information,

and to appear in court without handcuffs or leg irons. Articles from three different newspapers were attached to the motion.

On September 14, 1961, in the presence of counsel and the defendants, the district court heard the defendants' several motions. At that time photostatic copies of the defendants' purported confessions given to agents of the K. B. I. were furnished the defendants and their counsel and they were also furnished the names, addresses and occupations of the witnesses endorsed on the information. Separate trials were ordered for each defendant. Latham's plea in abatement was overruled. The motions for change of venue were sustained as to each defendant and the case was transferred to Russell County, the farthest east county in the 23rd judicial district, being some 150 miles east of Wallace County. A transcript of all proceedings was certified to Russell County with the exception of copies of the newspaper clippings attached to the motions for change of venue. At the conclusion of the hearing the district court ordered the defendants returned to the State Reformatory and further ordered that upon the filing of the transcript in Russell County the sheriff of that county take custody of the defendants and transfer them to the Russell County jail there to await trial. The district court also examined and approved the findings of the sanity commission and fixed the date of trial in Russell County for Monday, October 23, 1961.

On a date not disclosed, the defendants were permitted to withdraw their request to have separate trials and they consented to be tried jointly. Through their counsel they gave notice to take depositions in the state of Texas. Commencing on October 17, 1961, depositions of John W. Roper, M. D., Robert Nodine, M. D., John G. Higgins, M. D., Evan Katz, M. D., and Harris M. Hauser, M. D., were taken at Brooke Army Medical Center, near San Antonio, Texas, and at other points in Texas. The deposition of each doctor was filed with the clerk of the court in Russell County. As hereafter indicated, the depositions of Dr. Roper and Dr. Nodine were introduced in evidence at the trial.

On October 5, 1961, the defendants were transferred to the Russell County jail. On October 23, 1961, the day set for trial, court appointed counsel for the defendants made application for change of venue, or in the alternative for the appointment of local counsel to assist them in the trial. The district court overruled the motion for change of venue, but sustained the motion for the appointment

of local counsel and appointed Marvin E. Thompson to represent York and Richard M. Driscoll to represent Latham to assist previously appointed counsel. Both Thompson and Driscoll are able and experienced lawyers and regularly practice law at Russell.

Following their appointment, Thompson and Driscoll advised the court that they were not prepared for trial and orally moved that the trial be continued to the January 1962 term of the court to enable them to make adequate preparation. The motion was overruled, but the court continued the trial until the following morning. On October 24, 1961, Thompson and Driscoll filed their verified motion for continuance of the trial until the January 1962 term of the court. Among other things, counsel stated that they ascertained that a reasonable doubt existed as to the mental capacity of the defendants on June 9, 1961, to have committed, or be held responsible for committing, the acts charged in the information and alleged that as late as March, 1961, the defendants underwent psychiatric examinations by Army Medical doctors at Brooke Medical Center, Fort Sam Houston, Texas, who were capable psychiatrists, who determined that the defendants were suffering from chronic, severe and unimproved anti-social personalities to a marked degree of psychiatric impairment for military service; that a thorough and comprehensive psychiatric examination of the defendants would disclose a reasonable doubt as to their mental capacities to deliberate, or act wilfully, or with premeditation on June 9, 1961, and that a continuance of the trial was necessary to secure an examination by staff members of the Menninger Clinic at Topeka or staff members of the Larned State Hospital, or by other competent psychiatrists. The motions were argued to the court on October 24, 1961, and overruled.

Approximately 275 jurors were examined on *voir dire* which consumed the first week of trial. Sixty jurors were duly qualified and in each instance the defendants and each of them stated that they passed the juror for cause, or "we pass for cause." Thereafter the defendants and the state struck the statutory number of peremptory challenges (G. S. 1949, 62-1402, 1403). Two alternate jurors were chosen and peremptory challenges waived. Upon the selection of the twelve jurors and the two alternates the trial commenced.

The state's evidence established the following facts: On the afternoon of June 9, 1961, the body of Otto E. Ziegler, a roadmaster for the Union Pacific Railroad Company, was found by two fellow

employees about three or four miles east of Wallace, Wallace County, Kansas. The body was found on the north side of the Union Pacific railroad tracks where they cross a fill about four feet high. South of the tracks and below the fill was a four-strand barbed wire fence. Highway 40 is immediately south and parallel to the railroad tracks but the two are separated by the fence, grass and weeds. The body could not be seen from the highway or at any point as one approached its location from the south.

When the body was discovered, there were three apparent bullet holes in the head. South of the railroad tracks and across the barbed wire fence southerly, two empty .38 caliber cartridge cases were found. The decedent was clothed in a white shirt, a straw hat that had two holes in it, and beside his body was found a billfold or pocket book, and a pass case, also some other papers.

A yellow pickup used by the decedent in the performance of his duties for the Union Pacific was found along Highway 40, headed in an easterly direction some distance east of the point where the body was found.

G. B. Secavec, M. D., of Oakley, performed an autopsy on the decedent's body. The autopsy showed four wounds caused by a penetrating object of some kind, one in the left chest and three head wounds. Doctor Secavec removed a projectile bullet from the body and at a later autopsy he removed two other objects, both projectiles of bullet type. His opinion was that the first bullet to enter the body was the one through the chest, and "that each bullet that entered the body caused the fatal wound." The testimony disclosed that it was the doctor's opinion that one bullet failed to enter the body but glanced off the head.

On June 10, 1961, the day after Ziegler was killed, the defendants were apprehended by the sheriff of Tooele County, Utah, at a road-block on U. S. Highway 40 in a 1960 red Dodge Dart with whip antenna bearing a 1961 Russell County, Kansas, license plate. When apprehended, the sheriff told the defendants he was arresting them on a federal charge of stealing an automobile. Two guns were found in the glove compartment of the car, a .38 caliber Colt and a .22 caliber Eig, which were turned over to agents of the Federal Bureau of Investigation. Also two pair of workman's gloves, .22 and .38 caliber ammunition, a 100-foot Evans tape, and other items were found in the glove compartment.

The defendants were in the sheriff's custody until approximately

6:00 p. m. on June 10, when he surrendered them to agents of the F. B. I. The agents returned the defendants to Salt Lake City the same day, took them before a United States commissioner and charged them with the interstate transportation of a stolen motor vehicle. The commissioner advised each defendant he could have an attorney appointed to represent him but neither defendant availed himself of that right. They were then taken to the Salt Lake City jail.

The state offered in evidence certain written statements and/or confessions of the defendants and oral conversations had between them and F. B. I. agents and K. B. I. agents at Salt Lake City and at Sharon Springs following their return to Kansas. The statements and/or confessions were given to the F. B. I. and K. B. I. agents separately and at different times.

After hearing evidence, out of the presence of the jury and in the presence of the defendants and their counsel who made extensive cross-examination of the F. B. I. and K. B. I. agents, the district court found that the defendants' oral and written statements were freely and voluntarily given, that they met constitutional require-ments, and were admissible in evidence.

The following is a résumé of the defendants' written and oral statements given to the F. B. I. and K. B. I. agents in Salt Lake City and Sharon Springs: On May 24, 1961, the defendants de-serted from the United States Army and escaped together from the stockade at Fort Hood, Texas. Later, they stole a 1960 red Dodge Dart automobile with a whip antenna in Illinois and came into Kansas from the east on Highway 40-Interstate 70. After going some distance they met a highway patrol car which slowed down, and they turned off Interstate 70 at the next exit and continued west on Highway 40. About 9:00 o'clock p. m. they came to a small town on the south side of the highway where they decided to get a different license plate. They drove into the town, took a license plate from a parked 1959 Chevrolet, and drove west to a town which they thought was Russell. West of Russell they turned off the highway, drove north across the railroad tracks, removed and threw away the Illinois license plate and and replaced it with the Kansas license plate taken from the Chevrolet. They drove back toward the highway and slept until about sunup on June 9, 1961, and continued west on Highway 40.

The defendants, running short of money, looked for a small out-of-the-way service station to rob, but found none. Farther west they stopped twice and opened the car hood on pretense of car trouble, but no one stopped; they drove on west until they saw a man (identified by the state's evidence to be Ziegler) clothed in a white shirt talking with a man on a handcar on the railroad tracks. They noticed a yellow pickup truck on the highway near the fence, south of where the two men were talking. Since Ziegler was wearing dress clothing they thought he would have more money than the average railroad worker, and he looked like a good man to take. They drove west a short distance but kept the pickup in view. In a short time Ziegler got into the truck and drove west and the defendants got out, propped open the car hood and waived him down. Ziegler asked them what their trouble was and York told him the gas line was broken and asked for a lift to the next town and Ziegler said "get in." The defendants got into the pickup and after traveling west a short distance both pulled their guns. York was carrying a .38 Colt and Latham had a .22 Eig. They told Ziegler they wanted his money, and he said, "Oh, that's the kind of boys you are." They directed him to follow orders, and they continued on west looking for an out-of-the-way place, a clump of trees, or some place to take him. About three miles west they noticed a fencerow and the railroad tracks back some distance from the highway. They thought that would be a good place to take Ziegler because if anyone came along they would figure it was a railroad man working. They had Ziegler drive the pickup close to the fence and then had him give them his money. Ziegler gave them $51 from his billfold and said, "I'll see that you boys are gotten for this," and York said, "You said the wrong thing. Now you son of a bitch, we are going to have to kill you."

The defendants ordered Ziegler out of the pickup and as he got out he started to run toward the highway and York told him he would have to follow orders or they would kill him there. Ziegler said, "I don't want you to kill me." The defendants directed him through the fence and across the north side of the railroad tracks and there asked him, "Have you given us all of your money?" Ziegler said he had, and got his billfold to show them and as he opened it some papers fell to the ground. He was very nervous and he started to stoop over and as he stooped York shot him through the heart with his .38. Ziegler fell face down and did not struggle.

York shot him once more through the right side of the head to be sure he was dead. Latham shot him twice in the head with his .22; once through the center.

After shooting Ziegler the defendants returned to the pickup and Latham got in to drive; before York got in on the right side, he removed two empty .38 cartridges from his gun and threw them on the ground and then reloaded his gun. Latham drove the pickup back to their Dodge and parked it on the south side of the ditch where they searched it for something of value. They found two pair of gloves and a 100-foot steel tape in the glove compartment. They wiped the pickup clean of fingerprints, locked it, and Latham threw the keys in a field nearby. They then continued west on Highway 40 and left Kansas.

Following their return to Wallace County, the defendants, accompanied by the K. B. I. agents and the sheriff, returned to the scene of the crime and pointed out where they left the pickup and the location of the keys. The Illinois license plate was found in a roadside ditch just west of Russell on a road north of the railroad tracks.

An employee of the Union Pacific Railroad testified that the keys found by one of the defendants fit the locks in decedent's company pickup. Another employee identified the 100-foot steel tape as belonging to Ziegler, being the same tape taken from the car driven by the defendants at the time of their apprehension.

At the close of the state's evidence the defendants' motions to withdraw the first degree murder charge from the jury, motions for discharge, and to withdraw certain of the state's exhibits, were considered by the court and overruled.

After making their opening statement to the jury, the defendants offered the deposition of John W. Roper, M. D., taken by defendants' counsel at Brooke Army Medical Center near San Antonio, Texas. Dr. Roper identified himself as Chief of the Mental Hygiene Consulting Service at Fort Hood, Texas. He identified defendants' Exhibits 1 and 2 as a psychiatric evaluation of Latham and York, respectively, made on April 11, and April 12, 1961, by Dr. R. C. Nodine, a Medical Corps psychiatrist of the Mental Hygiene Consulting Service. When interviewed, both defendants were confined in the stockade following a period of AWOL. Exhibits 1 and 2 were admitted in evidence pursuant to stipulation of the parties. The diagnosis was that Latham was "Passive-aggressive reaction,

chronic, severe; manifested by AWOL, theft, poor educational history, extremely poor motivation, and poor work history." The diagnosis was that York was "Passive-aggressive reaction, chronic severe; manifested by previous AWOL's, poor educational history ambivalent motivation, and excessive concern about his relations with his parents." Both exhibits further showed as to each defendant, that they were "mentally responsible to distinguish right from wrong, adhere to the right and co-operate in his own defense if such is necessary. There are no psychiatric contradictions to any administrative action deemed appropriate."

The deposition of Robert Nodine, M. D., who signed defendants' Exhibits 1 and 2 was admitted in evidence. He testified that he interviewed Latham and York in April of 1961; that neither manifested any unusual tendencies; that they were "ordinary run of the mill stockade prisoners." When asked whether he noticed anything about the defendants that might cause them to go out and attack people or kill people or do anything unusual, his answer was "no," and that he did not have "any suspicion that there was anything like that."

Dr. William Wilks, a member of the staff of the Larned State Hospital and a member of the sanity commission, testified that as a result of his examination of the defendants and his examination of defendants' Exhibits 1 and 2, his diagnosis of York was "Sociapathic personality with paranoid traits," and that as to Latham his diagnosis was "Schizoid personality with sociapathic features or traits." He further testified that each defendants' mental illness, if any he had, "pertained to personality problems and that was a different field of mental illness and was not a psychotic disorder that caused people to be legally insane."

The testimony of John D. Munns, Sr., Superintendent of the State Reformatory, related to his knowledge of the defendants while they were detained in the State Reformatory at Hutchinson after their return to Wallace County on June 16, 1961, and that he had not known them prior to that time.

Three other witnesses testified for the defendants. Betty Rhoddy, a sister of Latham, testified to his early life; his family life and the number of his brothers and sisters; his service overseas in the Army, and that she had no knowledge of the commission of the crime itself. Mrs. R. T. Stewart, an aunt of Latham, testified about his early youthful days; family disagreements that led to a divorce;

the members in his family and number of relatives; his service with the armed forces and that so far as she knew he had been a law-abiding citizen. Mrs. Horace York, mother of York, testified in his behalf. Her testimony related to his early life, his school through the tenth grade; that he had done well in school; that he had qualified for an electrical course in the communications department of the Army, and that he was receiving treatment for nervous and emotional upsets and that the Army doctor had recommended his discharge.

No rebuttal testimony was offered by the state at the close of the defendants' testimony.

At the request of the court, instructions were submitted by both the state and the defendants. The number of instructions requested by the state is not disclosed but the defendants requested 46 instructions. In denying and refusing to give requested instructions, the court stated that any and all instructions submitted and requested by the state and the defendants which were not given in the form requested were refused by the court in the form requested, but as hereafter indicated, the instructions given by the court correctly stated the law applicable to murder in the first degree under the evidence. Thereafter, the jury returned its verdict finding the defendants guilty of murder in the first degree and assessed the death penalty as to each defendant.

The defendants first contend that Sec. 21-403 under which they were sentenced to death, violates two basic concepts of our federal and state constitutions: First, that it delegates the legislative power to prescribe punishment to the judiciary to be exercised by the jury in violation of Art. 2, Sec. 1 of the constitution of Kansas, and second, that it constitutes a denial of equal protection of the law in violation of the Fourteenth Amendment to that class of persons who are found guilty of murder in the first degree. The contentions will be discussed separately.

In support of the first contention the defendants argue that the statute fails to lay down any rules or standards by which the jury may choose between the two alternative punishments—life imprisonment or death, and assert that the delegation of legislative power exists when both punishments are provided without any standards or basic conditions of fact upon which the jury may choose between the punishments provided. In making the contention the defendants concede there are no Kansas cases which

have decided the point, and they cite no cases from other jurisdictions on the precise question. The pertinent portion of the statute reads:

"Every person convicted of murder in the first degree shall be punished by death, or by confinement and hard labor in the penitentiary of the state of Kansas for life. If there is a jury trial the jury shall determine which punishment shall be inflicted. If there is a plea of guilty the court shall determine which punishment shall be inflicted, and in doing so shall hear evidence. . . ." (G. S. 1949, 21-403.)

As preliminary to discussing the contention, we note rules pertinent to its consideration. First, the sole power to provide for punishment of offenders belongs to the legislature. It alone has the power to define offenses and affix punishment. Courts are empowered only to ascertain whether an offense has been committed, and if so to assess punishment, within the terms of the law, for its commission (*State v. Page*, 60 Kan. 664, 667, 57 Pac. 514; *State v. Tyree*, 70 Kan. 203, 78 Pac. 525; 16 C. J. S., Constitutional Law, § 107, pp. 493-495; 11 Am. Jur., Constitutional Law, § 192, p. 892).

Second, it is a well-settled concept of constitutional law that in distributing the power of government, the constitution of Kansas creates three distinct and separate departments; the legislative, the executive, and the judicial. Their separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, namely, to preclude a commingling of these essentially different powers of government in the same hands. The doctrine of separation of powers of government is to enable the government to control the governed; and also to oblige it to control itself. The latter is as important as the former and more difficult. Its object is the protection of the liberties of the people from the accumulation of too much power in the hands of any person or factions and is essential to the survival of our government. Hence, it is imperative that each department should be kept completely independent of the other—independent not in the sense that they shall not co-operate to the common end of carrying into effect the purposes of our constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to the coercive influence of either of the other departments (*State v. Johnson*, 61 Kan. 803, 60 Pac. 1068; *Rutland v. City of Augusta*, 120 Kan. 42, 242 Pac. 456; *State, ex rel., v. Anderson*, 180 Kan. 120, 299 P. 2d 1078; *State, ex rel., v. State Office Building*

*Commission,* 185 Kan. 563, 345 P. 2d 674). See, also, *Myers v. United States,* 272 U. S. 52, 71 L. Ed. 160, 47 S. Ct. 21, and *O'Donoghue v. United States,* 289 U. S. 516, 77 L. Ed. 1356, 53 S. Ct. 740.

Third, the constitutionality of a statute is presumed and all doubts must be resolved in favor of its legality and before it may be stricken down it must clearly appear the statute violates some express or implied provision of the constitution (*State, ex rel., v. Fadely,* 180 Kan. 652, 659, 308 P. 2d 537, and cases cited). Under such circumstances it is the court's duty to uphold the legislation rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done (*State, ex rel., v. Board of Education,* 137 Kan. 451, 453, 21 P. 2d 295; *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P. 2d 71).

Fourth, this court is neither authorized nor does it have any disposition to debate the question of the wisdom of capital punishment. The legislature determines the policy of the state in that regard and enacts statutes which the courts and other officials with respect thereto are bound to follow, which duties they are not privileged to ignore (*State v. Miller,* 165 Kan. 228, 194 P. 2d 498; *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739; *State v. Wilson,* 188 Kan. 67, 68, 360 P. 2d 1092; *State v. Hickock & Smith,* 188 Kan. 473, 485, 363 P. 2d 541).

Does Sec. 21-403 delegate legislative power to a jury? We think not. It is clear from a consideration of the statute that the legislature determined that the punishment for those convicted of murder in the first degree shall be life imprisonment or death. Under the statute and our decisions construing it, where a defendant is found guilty by a jury of murder in the first degree it is the duty of the jury, and the jury alone, to determine whether the death penalty or life imprisonment shall be inflicted (*State v. Christensen,* 166 Kan. 152, 157, 199 P. 2d 475; *State v. Hickock & Smith,* supra; *Andrews v. Hand,* 190 Kan. 109, 115, 372 P. 2d 559).

The legislative power was exercised when the legislature fixed the punishment for murder in the first degree. The statute does no more than empower a jury, upon a consideration of all the evidence and the court's instructions, to assess the extent of punishment prescribed beforehand in accordance with the heinousness or gravity of the homicide. In performing that duty, the jury in no sense exercises legislative power. In *The People v. Roche,*

389 Ill. 361, 59 N. E. 2d 866, it was held that an act of the legislature empowering a court or jury to assess punishment within the limits prescribed, is valid as against the claim that it is a delegation of legislative power to prescribe punishment. The court reached this same result in *The People v. Reid*, 396 Ill. 592, 72 N. E. 2d 812. We conclude the statute can in no sense be said to be a delegation of legislative power to prescribe punishment for a criminal offense.

With respect to the second contention that 21-403 constitutes a denial of equal protection of the law to that class of persons found guilty of murder in the first degree, the defendants assert the denial is effected in two ways; first, the statute permits the imposition of different punishments upon persons found guilty without establishing any circumstances under which one punishment or the other may be imposed thus permitting persons convicted of the same crime to be punished differently, and second, that the statute has been continued in force by a legislature which has refused and continues to refuse, despite the constitutional mandate of Art. 10, Sec. 2, to effect a reapportionment every five years, based upon the census of the preceding year.

With respect to the first point, it is argued that there was only one homicide and that while each defendant was convicted and sentenced to death, it cannot be denied the jury could have imposed the death sentence on one and life imprisonment on the other, and that nothing in the statute would have prevented such an unequal application of the alternative punishments. Further, that the possibility of unequal punishment is not obviated by the fact that each was sentenced to death, since it is the possibility of unequal application of a statute that is recognized and condemned by constitutional safeguards. The point is not well taken.

Viewing the statute as here construed, the fact that a jury could impose life imprisonment in one case and death in another, or different punishments in the same case, does not result in the possibility of unequal punishment to that class of persons convicted of murder in the first degree. The legislature has a very great latitude in prescribing and fixing the punishment for crime (*State v. Woodman*, 127 Kan. 166, 272 Pac. 132; *In re Skinner*, 136 Kan. 879, 18 P. 2d 154; 12 Am. Jur., Constitutional Law, § 562, p. 254). In *McGowan v. Maryland*, 366 U. S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101, it was stated that the Fourteenth Amendment permits the states a wide scope of discretion in enacting laws which affect some groups

of citizens differently than others. In *Collins v. Johnston,* 237 U. S. 502, 59 L. Ed., 1071, 35 S. Ct. 649, it was said that the establishment of appropriate penalties for the commission of crime and to confer upon the judicial tribunals a discretion respecting the punishment to be inflicted in particular cases, within the limits fixed by the law-making power, are functions peculiarly belonging to the several states. See, also, *Oyler v. Boles,* 368 U. S. 448, 7 L. Ed. 2d 446, 82 S. Ct. 501; *Lisenba v. California,* 314 U. S. 219, 226, 86 L. Ed. 166, 62 S. Ct. 280.

The statute prescribes the punishment beforehand which forms a constituent part of the sentence of conviction and it is not a denial of the equal protection of the law clause for a jury in assessing the extent of the punishment prescribed, to determine which of the alternative punishments shall be imposed by the court upon a verdict of guilty. The statute rests upon grounds relevant to achieve the state's objective and it is not objectionable as urged by the defendants that different punishments may result for different persons convicted of murder in the first degree. There is nothing to support the contention that the statute under which the sentences were imposed violates the provisions of the Fourteenth Amendment in depriving the defendants of their liberty without due process of the law or in denying them the equal protection of the law (*Collins v. Johnston,* supra). See, also, *Berger v. Hand,* 190 Kan. 220, 223, 373 P. 2d 175.

We turn now to the second point, that the statute denies equal protection of the law because it has been continued in force by a legislature which has refused to effect a new apportionment every five years as required by Art. 10, Sec. 2. The defendants make no claim that Sec. 21-403 was invalid at the time of its enactment in 1937 (Laws of 1937, Ch. 210, Sec. 1), or that it violates any provision of our constitution. It is argued instead that this court may take judicial notice that the state senate has not been reapportioned since 1947, and contend that the continuation of the statute by five subsequent unconstitutional legislatures has denied them equal protection of the law in that they have been denied any opportunity for the statute to be repealed, amended or modified to either abolish the death penalty or provide the circumstances under which a jury or court could choose between alternative punishments provided. They cite and rely upon *Baker v. Carr,* 369 U. S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691, in which it was held that a complaint

by certain state voters containing allegations that a state statute effected an apportionment that deprived them of equal protection of the laws presented a justiciable constitutional cause of action, and if discrimination was sufficiently shown, the right asserted was within the reach of judicial protection under the Fourteenth Amendment. The decision is no authority that all enactments of a legislature elected without complying with the constitutional mandate requiring periodic reapportionment are invalid, or that such enactments become invalid because not re-examined, repealed, amended or modified by subsequent legislatures elected under the apportionment statute.

Assuming that the legislature has failed to effect a new apportionment of the districts of its members as required by Art. 10, Sec. 2, nonetheless the acts of such legislative body would be those of a *de jure* legislature and the members thereof are *de jure* officers. All the reported decisions sustain the proposition that the fact a legislature has not reapportioned in accordance with the state constitution does not preclude it from making any law or doing any act within the legislative competence. A few of those decisions are: *Groves v. Board of Education,* 367 Ill. 91, 10 N. E. 2d 403, 405; *City of Cedar Rapids v. Cox,* 252 Iowa 948, 108 N. W. 2d 253; *Leonard v. Maxwell Comr. of Revenue,* 216 N. C. 89, 3 S. E. 2d 316; *Fruit v. Metropolitan School District, etc.,* 241 Ind. 621, 172 N. E. 2d 864; *Everglades D. League v. Napoleon B. Broward D. Dist.,* 253 Fed. 246, appeal dismissed 251 U. S. 567, 64 L. Ed. 418, 40 S. Ct. 219; *State v. Bomar,* 209 Tenn. 567, 345 S. W. 2d 763; *State v. Tahash* (Minn. 1962), 115 N. W. 2d 687; *State v. Doggett* (Okla. 1956), 296 P. 2d 185. Any other conclusion would result in the destruction of state governments.

In *State v. Bomar,* supra, the supreme court of Tennessee held:

"Failure of legislature to reapportion had no bearing upon the validity of rape conviction of petitioner sentenced to death by electrocution, where crime had been punishable by death in state continuously from 1871, even though provision for electrocution was enacted at time when General Assembly had not reapportioned itself in compliance with Constitution." (Syl. ¶ 7.)

In *State v. Doggett,* supra, the criminal court of appeals of Oklahoma said:

"To sustain the contention of the petitioner would result in creating a state of chaos and confusion. Probably 95 percent of the prisoners now confined in penal institutions of the state have been committed for violating some statute enacted subsequent to what the petitioner claims was the last valid apportion-

ment act of the Legislature and they would be entitled to their discharge. Property rights have been created pursuant to statutes enaced by the legislative assemblies, marriages have been contracted and divorces granted pursuant to legislative enactment. Public offices have been created and appropriations made to pay the salaries of such officers. To hold for the petitioner would result in the abolition of the Highway Patrol. It would result in the rescission of the laws authorizing the creation of turnpikes and toll roads. The appropriations under which every department of state government now operates would be illegal and the very functions of government would cease. . . ." (pp. 186, 187.)

The question of the failure of the legislature to reapportion itself in accordance with the mandate of Art. 10, Sec. 2, could have no possible bearing upon the validity of the defendants' convictions.

Defendants sought to introduce the testimony of John D. Munns, Sr., Superintendent of the Reformatory in Hutchinson, to show the general good character of the defendants and their amenability to prison routine while in the Reformatory, and to give the jury the benefit of the witness' expert opinion on the subject of punishment, that life imprisonment is a more effective punishment as a deterrent to the crime of murder in the first degree than the death penalty. It was excluded by the court on the ground of immateriality. It is contended the testimony was material on the important issues of (a) the character of the defendants and their amenability to prison routine and regulations in the event they were sentenced to life imprisonment, and (b) as a material aid to the jury in determining which punishment to impose.

We are of the opinion the proffered testimony was not admissible, and the district court committed no error in excluding it. The testimony of good character pertained to the time while the defendants were in the Reformatory and not to the time of the commission of the offense or prior thereto. Character evidence, to help prove and evaluate, and to be admissible, must be confined to a time not too remote from the date of the commission of the offense. The general rule is that evidence of the defendant's character after the commission of the crime with which he is charged, is inadmissible (20 Am. Jur., Evidence, § 331, p. 309). And the rule is well settled that when a defendant in a criminal action undertakes to establish good character as an element of his defense to the offense charged, he is limited in his proof to testimony regarding his general reputation for possessing the traits involved, in the community where he resides (*State v. Frederickson*, 81 Kan. 854, 106 Pac. 1061; *State v.*

*Howland,* 157 Kan. 11, 138 P. 2d 424). In *State v. Kirby,* 62 Kan. 436, 63 Pac. 752, it was said:

". . . When character is in issue, the law limits the inquiry to general character, and not to specific acts; not the estimate of a few, nor the opinion of a part of the community; but it can be shown only by common report, general reputation and opinion generally entertained of the party in the community where he lives. . . ." (l. c. 445.)

While Munns' views on capital punishment would be proper before a legislative committee, they were wholly irrelevant before the jury. The penalty for murder in the first degree has been fixed by the legislature. The wisdom or deterrent effect of that penalty is for the legislature to determine and therefore is not a justiciable issue. A jury in a capital case cannot become legislators *ad hoc* and trials on the issue of penalty cannot be converted into legislative hearings (*People v. Love,* 56 C. 2d 720, 336 P. 2d 33).

It is next contended the district court erred in denying the defendants' request for psychiatric examination on October 24, 1961, to determine their mental capacity on the date of the homicide, and that the court abused its discretion in denying local counsel appointed to assist previously appointed counsel additional time in which to prepare for trial and to obtain psychiatric testimony. The contention presupposes the defendants were entitled, as a matter of statutory right, to an examination to determine their mental condition on the date of the killing. That was not the case. They were afforded the examination they were entitled to under our statute (G. S. 1949, 62-1531) and which was required under the circumstances (*State v. Badders,* 141 Kan. 683, 686, 42 P. 2d 943). The question of their lack of mental capacity at the time of the alleged commission of the crime, is to be determined by the jury empaneled to try the case, upon the evidence introduced bearing upon the issues, and not by a commission (G. S. 1949, 62-1532; *State v. Eye,* 161 Kan. 69, 166 P. 2d 572; *State v. McBride,* 170 Kan. 377, 226 P. 2d 246; *State v. Andrews,* supra; *State v. Hickock & Smith,* supra).

Did the district court abuse its discretion in denying local counsel's motion for continuance? In considering this point we refer to the long standing rule that the matter of a continuance in a criminal case is largely in the discretion of the district court. Unless the ruling prejudices the defendant's substantial rights in the trial of his case it will not be disturbed (*State v. Hickock & Smith,* supra, and cases cited). Counsel appointed at Sharon Springs were active

and diligent in preparation for the trial. They filed numerous motions, and were successful in having the venue changed from Wallace County to Russell County. Prior to the commencement of trial, they served notice to take the depositions of five Army medical doctors at Brooke Medical Center, who knew the defendants and who had made psychiatric examinations of them, and each doctor's deposition was filed with the clerk of the court at Russell. Immediately before the trial commenced, they filed another motion for a change of venue or in the alternative for the appointment of local counsel to assist them in selecting a jury and to aid in the trial. The vigor and industry displayed by originally appointed counsel is the best proof that defendants suffered no prejudice through the refusal of a continuance. Although the record does not clearly indicate the number of times counsel conferred with the defendants at Hutchinson, it does reveal that conferences were had; that counsel made necessary investigations to obtain evidence, and did obtain it before trial. Moreover, the first week of the trial was given in selection of a jury; no evidence was introduced until October 30. In arguing the admissibility of the defendants' confessions and/or statements, one of the court appointed counsel at Russell stated "We have the entire law of Kansas on it." Inexcusable delay in the enforcement of our criminal law is one of the grave evils of our time, and delays incident to motions for continuance have come in many cases to be a distinct reproach to the administration of justice. Prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to confer with counsel and to prepare his defense. Those rights were afforded the defendants. A careful reading of the record compels the conclusion that the four court appointed attorneys vigorously represented the defendants at the trial. They showed great zeal, industry and resourcefulness, and displayed exceptional talents in protecting the rights of the defendants at each and every step of the trial. It cannot be said that the denial of local counsel's motion to continue constituted an abuse of the court's discretion.

Nor do we think the district court abused its discretion in denying the motion to obtain psychiatric testimony. Two depositions taken at Brooke Medical Center were introduced in evidence by the defendants, and showed that each defendant was "mentally respon-

sible to distinguish right from wrong, adhere to the right and co-operate in his own defense if such is necessary." Likewise, Dr. Wilks, a staff psychiatrist at the Larned State Hospital and a member of the sanity commission, testified for the defendants that they might have some mental impairment in the way of sociopathic personalities with paranoid traits but that was a different field of mental illness and was not a psychotic disorder that caused people to be legally insane. This court is firmly committed to the M'Naghten rule, or "right and wrong" test of insanity (*Andrews v. Hand,* supra, and cases cited), and there was no showing in the affidavits for continuance or in any of the motions asking for additional time, that the defendants were not able to distinguish between right and wrong or that any psychiatrist would have testified they were incapable of distinguishing right from wrong at the time of the killing so as to excuse them from the legal consequences of their act.

The defendants contend they were not afforded their constitutional right to counsel. In view of what has been heretofore said it seems unnecessary that the question be further discussed. However, the defendants cite and rely upon *Powell v. Alabama,* 287 U. S. 45, 77 L. Ed. 158, 53 S. Ct. 55, which holds in effect that in a capital case it is the duty of the court to assign counsel for defendant as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. It is approximately 280 to 300 miles from Hutchinson to Sharon Springs and Goodland, and the defendants contend that their right to due process of law was violated since originally appointed counsel "were under such circumstances" because of the distance, and local counsel were appointed "at such a time" as to preclude the giving of effective aid in the preparation of the trial of the case. They refer to G. S. 1961 Supp., 62-1304, which provides in substance that counsel employed or appointed for an accused shall have free access to him at reasonable hours for the purpose of conferring with him concerning the charge against him and advising him with respect to his plea and to prepare his defense if one is to be made. Also, to G. S. 1949, 62-1304a, which provides in effect that any person held in confinement shall be permitted upon request to immediately confer privately with an attorney of his choice. The contention is without merit.

The removal of the defendants to the State Reformatory was for

the defendants' protection and because the facilities in Wallace County were not sufficient. Counsel for the defendants knew where they were and had freedom of access to confer with them at all times. Despite the distance, originally appointed counsel conferred with the defendants at Hutchinson and made necessary investigations to obtain evidence and did obtain it before trial. In so doing, counsel for Latham spent 17 days of preparation and counsel for York, 24 days of preparation before trial for which they claimed their expenses and statutory per diem. Moreover, the order of the court changing the venue to Russell County was done at their request. While no motion was made for appointment of local counsel until October 23, originally appointed counsel could have moved for such appointment on October 2, 1962, the first day of the regular October term. In considering the contention that local counsel was appointed "at such time" as to preclude giving effective aid in the preparation and trial of the case, we refer to the record which indicates the extent of preparation of counsel when, in arguing the admissibility of the defendants' confessions and/or statements, one stated, "We have the entire law of Kansas on it." We here reiterate what has been said concerning the zeal, industry, resourcefulness and talents displayed by counsel for the defendants. While it is the duty of district courts in the administration of the law to see that the accused, however guilty he may be, shall have a fair trial according to the due and orderly course of the law, and this duty is emphasized in a capital case, it cannot be said that the defendants were denied their right to due process of law upon the grounds urged.

The defendants next contend the district court erred in overruling their objection to a question propounded to jurors on *voir dire* examination. The state's attorneys asked the jurors the hypothetical question: "If you believe the facts so warrant, after hearing the evidence from the witness stand and the instructions of the court, is there any reason why you could not return a sentence of death in this first degree murder case?" This was followed by routine questions as to whether the juror could return a sentence of death or if he had any religious or conscientious beliefs that would prevent him from doing so. The defendants argue the question prejudiced the jury against them, and hence destroyed their right to learn who should be disqualified or challenged.

As previously indicated, 60 jurors were qualified for cause before

any peremptory challenges were exercised. In the selection of each of the 60 jurors from whom the jury was finally selected, each defendant solemnly stated that he "passed for cause." Peremptory challenges were thereafter exercised. The defendants concede the scope of a *voir dire* examination must be left virtually to the sound discretion of the district court, and we think no error was committed in permitting the state's attorneys to ask the question complained of. In the first place, having passed each juror for cause, there was no one on the jury to whom the defendants objected (*State v. Springer*, 172 Kan. 239, 245, 239 P. 2d 944). In the second place, pertinent statutes read:

"If the offense charged be punishable with death, any person entertaining such conscientious opinions as would preclude his finding the defendant guilty shall not serve as a juror." (62-1404.)

"No person who believes the punishment fixed by the law to be too severe for the offense or entertains any opinion that would preclude his finding the defendant guilty, shall be sworn as a juror." (62-1405.)

The question was in conformity with the statutes and did not prejudice the defendants' rights to a fair and impartial trial. It was proper to determine whether, if the facts introduced in evidence and under the instructions of the court, and the jury agreed upon a verdict of guilty, the juror could impose the death sentence, if the facts so warranted (*State v. Curtis*, 108 Kan. 537, 540, 196 Pac. 445; *State v. Butler*, 131 Kan. 680, 682, 293 Pac. 756; *State v. Williams*, 182 Kan. 468, 471, 322 P. 2d 726).

The defendants further contend that the written and oral confessions and/or statements given to F. B. I. and K. B. I. agents during the period from their arrest to arraignment were involuntary; that they were gained by psychological tactics, and were erroneously admitted into evidence. It is argued that the defendants were only 18 years of age; that they were questioned repeatedly for two days by Utah police officers and by F. B. I. and K. B. I. agents, and that the confessions were extracted in one of the more "sophisticated manners of police enforcement, which destroys their voluntariness just as surely as if the defendants had been beaten or subjected to other abuses."

As previously indicated, the defendants were taken to the county jail in Salt Lake City on the evening of June 10, 1961. There, after identifying themselves as F. B. I. agents, Olson and Paxman interviewed Latham and Shepherd and Pleasant interviewed York separately, and advised them each was a possible suspect on a federal

violation for car theft. The interview with Latham lasted approximately 30 minutes, from 8:21 to 8:55 p. m., and the interview with York lasted about 50 minutes. Each defendant was advised he did not have to talk, and if he did any statement he made could be used against him in court, and that each had a right to the services of an attorney, which each defendant declined. Neither wanted to notify his parents.

Olson testified that Latham did not appear to be scared, nervous or afraid, but he did not talk freely. Shepherd testified that York would not discuss anything except his education; that he was born in Florida on February 6, 1943; about his family and military service, and that he had walked away from Fort Hood, Texas, on May 24, 1960.

The agents interviewed the defendants separately at the same place the following morning, and again advised each of his constitutional rights. After ten or fifteen minutes had elapsed, Latham, accompanied by Olson, came into the room where York, Shepherd and Pleasant were, and after two separate conversations between the defendants in a corner of the room outside the hearing of the agents, the defendants related their activities from May 24, 1961, to the date of the interview, and voluntarily told the agents about killing a man in Kansas. Until then all the information the agents had about a crime committed in Kansas had been received from other sources, and not until the defendants talked about it was it mentioned at the interviews. The following is a part of Olson's cross-examination:

"Q. How did you know what to put in this statement when you typed it up the next morning? A. They furnished the information. . . . Q. The statements were based on information furnished by them. A. Yes. Q. But yet you had never discussed it with this boy Latham? A. During our conversation prior to the time the statements were prepared Mr. Latham and Mr. York had given us the information concerning the crime in Kansas. Q. But you hadn't discussed it with them? A. We didn't have to. Q. You didn't have to? A. No. When they started to tell us about their travel from May 24, 1961, up until June 10 out of Grantsville, they told us what they had done."

The interview on the morning of June 11, 1961, lasted for an hour or so, and the defendants stated they would sign a written statement concerning their robbing and shooting Ziegler in Kansas. It was a "we" type statement where the defendants talked back and forth. During the interview the agents made notes and from the notes Olson prepared a typewritten statement for Latham, and

Shepherd prepared a typewritten statement for York. The statements were presented to the defendants during the late afternoon of June 11, 1961, and before signing them, each defendant wrote in his own handwriting that he had read the statement consisting of two pages and that it was true to the best of his knowledge. Both agents testified they treated the defendants with courtesy, were friendly to them and attempted to gain their confidence; that they gave them cigarettes and may have given them cokes, and that they learned each defendant had been subjected to psychiatric examination and treatment.

K. B. I. agents Duntz and Ford interviewed the defendants in the Salt Lake City jail on the evening of June 11. They introduced themselves, and told the defendants they were investigating the murder of Otto Ziegler near Wallace, Kansas; that they did not have to tell anything, and if they did it could be used as evidence in court, and that they were entitled to an attorney. The agents knew the defendants had been questioned by F. B. I. agents, and suggested that they might be tired and perhaps they (the agents) should return later, but the defendants stated "they were not hungry or tired and would prefer to make a statement at that time." They stated they wanted to make a joint statement, not separate statements. The interview lasted about 30 minutes. Ford testified to oral statements made by York relating to activities of the defendants in Kansas, and of conversations between the defendants and Ziegler not incorporated in their subsequently signed joint statement. He further testified that he originally prepared the statement in pencil, but upon defendants objection that such a statement could be changed, he then printed the statement signed by the defendants; that the joint statement was in his hand printing except the last paragraph which was in the handwriting of York as dictated by Latham, which reads: "We have read the above statement consisting of three pages, this being the last page. This being to the best of our knowledge is a true statement." The defendants signed the statement about 7:00 p. m. after which Ford got hamburgers and cokes for them. Ford and Duntz then visited with the defendants about 15 minutes and learned their homes were in the South and that they were members of the United States Army. He further testified that oral statements which he attributed to York, were entirely from memory; that he had not made notations during the interview concerning them.

Over the defendants' objections, Duntz testified at length that he heard the defendants make statements concerning the killing in Kansas, not in their written statement, which he called admissions. He further testified to conversations with the defendants on June 16, at the jail at Sharon Springs when York stated he would go with him to find the keys to the pickup.

The procedure followed by the district court in hearing evidence in the absence of the jury and deciding as a preliminary matter whether the oral and written statements and/or confessions of the defendants were freely and voluntarily made without force or coercion, was in conformity with the established rule of this court (*State v. Seward*, 163 Kan. 136, 181 P. 2d 478; *State v. Stubbs*, 186 Kan. 266, 349 P. 2d 936). With exceptional care and patience the district court considered all evidence offered by the state, and after vigorous cross-examination of the state's witnesses, it concluded the statements and/or confessions were freely and voluntarily given. That finding was amply supported by the evidence. No threats were made and there was no coercion or misrepresentations. On the contrary, the defendants freely discussed and voluntarily gave detailed statements to the F. B. I. and K. B. I. agents of the robbing and killing of Ziegler. No other conclusion could be reached by the district court, or by this court upon appellate review, but that the defendants' oral and written statements and/or confessions were freely and voluntarily given, and that they were admissible in evidence. Moreover, instruction No. 16 correctly informed the jury that if it found that an admission of guilt was brought about in whole or in part by threats, duress, promises, intimidation, artifice, or coercion, it could reject the same. Also, that the jury was the sole judge of the weight and credibility of any admission of guilt or confession the same as it was with respect to any other evidence in the case, and that it was at liberty to reject any part which it did not believe and to accept any part which it believed.

The contention is made that substantive due process was denied the defendants because an attorney was not present when the oral statements were made and the written statements were signed. The absence of counsel under such circumstances does not render a confession inadmissible (*State v. Seward*, supra; 2 Wharton's Criminal Evidence, 11th Ed., § 628, p. 1055; 20 Am. Jur., Evidence, § 503, p. 434). The defendants cite *McNabb v. United States*,

318 U. S. 332, 87 L. Ed. 819, 63 S. Ct. 608. The case is not in point. That was a federal prosecution for violation of a federal law and the rule there announced is not applicable to state procedure. Further, it is argued that the defendants were not brought before a magistrate and arraigned on a first degree murder charge until they were returned to Kansas on June 16, 1961. The argument is not impressive. As soon as the defendants were returned to Sharon Springs they were taken before the judge of the county court where their rights to a preliminary hearing were fully explained to them, and they waived the right to such a hearing in writing.

We have carefully examined *Rogers v. Richmond,* 365 U. S. 534, 5 L. Ed. 2d 760, 81 S. Ct. 735, and *Spano v. New York,* 360 U. S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202, cited by the defendants. The facts in each case bear no semblance to the case at bar. The evidence is clear that no coercion, psychological or otherwise, was exerted.

The defendants complain of the refusal of the district court to give numerous requested instructions, and in the giving of certain instructions. We have carefully examined the various contentions on this point and it would unduly extend an already lengthy opinion to detail and discuss each of them. It is sufficient to say that the court's instructions as a whole correctly stated the law of murder in the first degree under the facts and circumstances of the case. Several of the requested instructions contained the essential legal principles covered in the court's instructions in substance, if not in the exact form. However, one point requires attention. In instructions Nos. 7 and 9 the court instructed the jury it would first consider the offense of murder in the first degree as applied to each of the defendants and that before it could find them guilty, the state must prove to the satisfaction of the jury beyond a reasonable doubt the following essential elements (1) that the defendants on the date and place charged, did shoot and cause the death of Ziegler without lawful excuse, and (2) that the killing was committed in the perpetration or attempt to perpetrate robbery or a felony by the defendants, *or* that the killing was committed with willful intent, and that it was deliberate and premeditated and committed with malice. The defendants argue the instructions were erroneous and prejudicial, and contend that there was no evidence that the homicide was committed while in the perpetration of a

felony. We do not agree. The homicide occurred as a part of a continuous assault upon Ziegler to rob him and the court was fully justified in instructing the jury that if the state proved beyond a reasonable doubt that the killing was committed in the perpetration or attempt to perpetrate a robbery or felony by the defendants, it should find the defendants guilty of murder in the first degree (*State v. Roselli*, 109 Kan. 33, 198 Pac. 195; *State v. Jella*, 132 Kan. 509, 296 Pac. 350). Moreover, the evidence was sufficient to warrant the court in instructing the jury that if it found the killing was willful, deliberate, premeditated, and committed with malice, it should find the defendants guilty of the offense. The court committed no error in giving instructions 7 and 9.

The defendants insist that there was misconduct on the part of counsel for the state in their closing argument to the jury. To detail the remarks of counsel would serve no useful purpose. The argument abstracted tended to refer to a statement that a sentence for life does not necessarily mean the defendant will serve the full term of his natural life in prison. The defendants made no objection to the argument nor did they request that it be withdrawn and the jury admonished to disregard it. It is well settled that reversible error cannot be predicated upon a complaint of misconduct on the part of counsel for the state in the closing argument to the jury where the defendant makes no objection to the argument nor requests the court to withdraw the remarks and admonish the jury to disregard them. (*State v. Hobl*, 108 Kan. 261, 194 Pac. 921; *State v. Curtis*, supra.)

Counsel for the defendants have been diligent in advancing claims of error which we have meticulously examined to determine whether any possible error prejudicial to the rights of the defendants occurred. In addition to the brief of counsel, the defendants filed their handwritten joint supplemental brief *pro se* as *amici curiae*. The handwritten brief has likewise been carefully examined and no points are raised which were not raised and briefed by their counsel.

Our review of the record compels the conclusion that the defendants were given a fair and impartial trial and no grounds exist, specified or not, which would necessitate a reversal. The judgment rendered by the district court againt each of the defendants in conformity with the verdict of the jury is affirmed.

It is so ordered.