RIGOBERTO MOLINA SANTANA, Petitioner and Appellant, v. GERARDO DELGADO, WARDEN OF THE STATE PENITENTIARY, Respondent and Appellee.

No. AP-65-35.     Decided June 6, 1968.

*Edna Abruña Rodríguez, E. Armstrong Watlington,* and *Enrique Miranda Merced* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Elpidio Arcaya, Assistant Solicitor General,* for appellee.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The Superior Court, San Juan Part, having dismissed the petition for Habeas Corpus on the ground that appellant did not have adequate assistance of counsel in a case of murder and carrying of weapons, appellant assigns that said court erred in determining that petitioner had adequate

assistance of counsel at the hearing of said cases on June 12, 1962, which resulted in his conviction of murder in the second degree and carrying of weapons. The facts which gave rise to the accusations in this case occurred on April 24, 1961. The judgment was rendered on June 18, 1962.

The circumstances of the case recited below show that he is wrong.

At the outset of the hearing of the case of murder in the first degree and carrying of weapons, appellant's counsel requested that the expert witnesses, who a month before had determined that appellant could stand trial, examine him again. They did so and informed that he could stand trial. Having waived his right to a trial by jury, appellant pleaded guilty of murder in the second degree. The incident on this particular was as follows:

"PROSECUTING ATTORNEY:

With the leave of the court. We want to inform that the People will prosecute the case as murder in the second degree.

JUDGE:

Plea, then?

MR. JULIÁ:

Hon. Judge, that being the situation, defendant shall plead through us, guilty of murder in the second degree.

JUDGE:

Q. Rigoberto, have you heard the plea, made by your attorney, of guilty of murder in the second degree?

A. Yes, sir.

Q. Do you subscribe to the words of the attorney?

A. Yes, spontaneously.

Q. Have you been forced or coerced by anybody?

A. Absolutely by no one.

Q. Has anybody promised you benefit or reward?

A. No, sir.

Q. Have you discussed your case with Mr. Juliá and do you agree with your attorney that you are guilty of murder in the second degree?

A. Yes, sir.

Q. Do you know that you were entitled to the presentation of evidence against you and then you could present your evidence if you had any?

A. Yes, sir.

Q. Do you waive that right and admit that you are guilty of the offense?

A. Yes, Hon. Judge.

J. Colleague, there is also case No. M-61-823, a misdemeanor.

Mr. Juliá:

Let us consider the charge in relation to the carrying of weapons as read, to which he also pleads guilty.

Judge:

Q. Rigoberto, did you hear the plea of guilty made by your attorney in this case where you are charged that on April 24, 1961 you carried a knife, which you used to commit a murder?

A. Yes, sir.

Q. And do you agree?

A. Yes, sir.

Q. And you make the plea voluntarily?

A. Yes, sir.

Q. Has anybody threatened you to plead guilty?

A. Absolutely no one.

Q. Has anybody made promises?

A. Nobody.

Q. Have you discussed the case with your attorney, Juliá, and do you agree that actually you are guilty of said facts?

A. Yes, sir."

For the purpose of supporting his assignment, appellant makes a summary of the evidence presented at the hearing of this case in the trial court. Let us see our own recital of the same.

Witness José O'Ferral Santos, custodian of records of the Veterans' Administration, testified that from appellant's records, which he had before him, it appeared that in 1949 appellant was confined in Clínica Juliá suffering from schizophrenia. He was granted a 100% disability. Later he went to the neuropsychic clinic of the Veterans' Administration for ambulatory treatment. He was confined in Clínica Juliá

from March 7 to 11, 1961. The diagnosis resulting from the psychiatric examination performed in 1956 was "Psychotic reaction, psychotic personality." Identical diagnosis was made in 1955. The last one, in 1963 was "Schizophrenic reaction, catatonic . . . ."

Appellant's testimony has been properly summarized by the Solicitor General with some modifications we have made as follows:

Molina Santana testified that he is a veteran and that he is receiving a pension corresponding to 100% disability. He testified that originally he was accused of murder in the first degree; that he retained the professional services of Mr. Charles H. Juliá to represent him at the trial "some time after" he was accused and after he was on bail. The bail was admitted on August 14, 1961. He visited his attorney several times in his offices, in the Capitol. He had talked to his attorney several times near the court, and although he went several times to see him, he could only see him on one occasion, when he conferred with him and on which occasion he said he had paid for his services. He affirmed that the case was continued on several occasions, but that he never came to an agreement with the attorney in relation to the issue of the case. He stated that he informed his attorney that he had a witness, and that he had asked the former to summon him, but the attorney told him that it was unnecessary.

Petitioner affirmed that he was not satisfied with his attorney's services because notwithstanding petitioner having asked his attorney to summon the physicians of the Veterans' Administration, he did not do it, nor did he procure the presentation of petitioner's records kept in the civil courts. Finally he testified that he pleaded guilty because his attorney had told him to do so and because "Dr. Galíndez told me to take his advice because I would rot if I were pronounced crazy"; that he knew in advance the sentence they would impose on him, and because the psychiatrist himself advised

him that it was better to be sentenced to 10 or 15 years than to remain confined in the insane asylum for life. Although he pleaded guilty he never felt he was guilty. In support of such a statement he invoked his mental condition, "because he saw and heard animals behind him saying 'dead or alive' and that is why he fired and when he woke up in his house he was informed that he had killed a person." However, he said he did not realize what had happened.

Mr. Juliá testified that:

He has been practicing law for thirty years. He met defendant when he went to retain his services to represent him in a case of murder. He conferred with petitioner on one or two occasions. The case had been continued several times and the attorney became acquainted with the fact that defendant had been under psychiatric treatment. He interviewed prosecuting attorney Torres González, who informed him that he had ordered a psychiatric examination immediately after the occurrence of the facts.

Mr. Juliá testified that defendant had recited to him his own version of the facts. He asked defendant whether he had witnesses and Molina Santana told him that he did not have any. According to what defendant informed him he had arrived at a public establishment with a knife; that a person had asked defendant to deliver the knife to him and that defendant had challenged him to take it away from him. That they started to wrestle and that as the person fell down he was wounded. The investigation performed by the attorney showed that the facts were different. The witnesses for the prosecution maintained that defendant had appeared at the premises with a knife, and without any interchange of words he stabbed the victim through the stomach.

He said that as soon as he became acquainted with the history of the case, he took steps in order that appellant be submitted to a psychiatric examination and insisted that

Dr. Señeriz form part of the examining panel, since he had been appellant's attending physician. Said panel concluded that appellant "could stand trial." He remembered having seen a psychiatrist's report to the effect that at the time of the occurrence, appellant was not mentally incompetent; but he did not recall his name. He explained that appellant went to retain his services many months after the occurrence of the facts. He admitted that a person who can stand trial at the time of the hearing may not have been sane at the time of the commission of the facts. When asked whether it was possible that two months subsequent to the act a psychiatrist could examine a person on the basis of his previous medical record and determine that it is possible that said person was suffering a mental disorder when the acts were committed, he answered that according to his experience the psychiatrists would report that it was not possible. He said that in his opinion "when the psychiatrists said that the man could stand trial, it discards the theory of insanity."

Dr. Galíndez, one of the psychiatrists who on several occasions examined appellant, testified that he examined him in April 1962 and that on four occasions he examined him together with psychiatrists Valderrábano, Señeriz and Tejedor, for the purpose of determining whether he could stand trial. He reached the conclusion that appellant was suffering from a schizophrenic reaction, paranoid in the remission of symptoms, this meaning that "The symptoms characterizing this [the mental disorder] have disappeared." When asked whether he could "determine whether by the year 1961 that person [appellant] could be under the effect of a doubtful mental condition," he answered:

"Undoubtedly. To answer that question I would certainly have to base my answer on a direct-psychiatric examination, the most recent examination; if this examination had been performed immediately after the commission of the offense, I could tell with more certainty and more scientifically, whether

said person was suffering this or that condition. Generally, I could tell you that he could or could not be sick.

Q. For example, that his mental condition would be such that he could not distinguish between right and wrong?

A. That possibility exists for everyone.

Q. You could not make that determination now nor could have made it that day?

A. To go back to '61, no. I say, he has a medical record, I imagine there is a record of the doctors who examined him, I imagine. I could not . . . ."

In *People* v. *Sánchez*, 79 P.R.R. 110 (1956), we said that defendant's insanity at the time of committing the criminal act is what exempts him from criminal liability; that his behavior before or after the commission of the acts does not prove that he was insane at the time he committed them; that the expert testimony as to defendant's mental condition after the commission of the criminal act is admissible in support of the defense of insanity, but when the testimony of an expert challenges the credibility of another expert, "it is incumbent on the jury to determine . . . which testimony to believe"; that the opinion of an expert witness is not binding upon the triers and that in weighing expert evidence the court is not bound to accept the opinions of an expert.

In *People* v. *Alsina*, 79 P.R.R. 44 (1956), we adopted the following rule:

"In our opinion, the rule of evidence which should govern when the question of insanity is raised to excuse from responsibility is this: The law presumes that sanity is the normal condition, a presumption which is justified by human experience and by considerations of public policy, and, hence, that the defendant was of a sound mind when he committed the act charged as an offense. By virtue of that presumption, The People is not required to offer any evidence to show that the defendant was sane at that moment, *unless* evidence is offered and received which may create a reasonable doubt as to sanity, which evidence must be furnished by the defendant if he relies on the absence

of mental soundness for exemption from responsibility, but which may also develop from the evidence offered by The People when presenting its case . . . . However, once there is evidence capable of creating that doubt, the presumption that the defendant was sane at the time of committing the act is overcome and the State is required to prove sanity as well as any other fact. After weighing the entire evidence as to the act charged and as to insanity, the trier is required to determine whether the prosecution has established defendant's sanity, his capacity to commit a crime, and, if it then entertains reasonable doubt, it is under the duty to give the benefit of that doubt to the defendant and to acquit him."

■ Although expert evidence relating to defendant's mental derangement some time prior or subsequent to the commission of the acts is admissible to prove the latter's mental incompetency at the time when he committed them, in determining its weight and credibility the trier can take into consideration the time elapsed between the date on which his condition was determined and the date of the offense. *Harriford* v. *Harriford*, 336 S.W.2d 113, 117 (Mo. 1960); *State* v. *Duncan*, 93 S.E.2d 421, 423 (N.C. 1956); *Poole* v. *State*, 207 S.W.2d 725 (Ark. 1948); *People* v. *Preston*, 173 N.E. 383 (Ill. 1930); *Sherill* v. *State*, 225 Pac. 840 (Col. 1924); *People* v. *Gavrilovich*, 106 N.E. 521 (Ill. 1914); *Swedley* v. *Commonwealth*, 127 S.W. 485 (Ky. 1910); *State* v. *McMurray*, 58 Pac. 961 (Kan. 1899); *People* v. *Hill*, 195 N.Y.S.2d 295, 299 (1960).

■ In the light of the foregoing, appellant's counsel did not neglect his responsibility in the case of murder by failing to allege the defense of insanity. It is true that appellant had a record of schizophrenia since long before the day of the occurrence of the facts.

■ For the purpose of establishing the defense of insanity, the best available evidence is the expert opinion of mental derangement resulting from an examination of the defendant "immediately after the commission of the offense,"

as Dr. Galíndez testified. Said physician testified that if the examination is performed too late, it can only be said "that he could or could not have been insane." *Cf. People* v. *Rivera Raquel,* 95 P.R.R. 553 (1967). Instead of such evidence the attorney had knowledge that the available evidence was that, at that time he was sane, as we indicate hereinafter.

On the contrary, in relation to the information on which the attorney for the defense relied for his determination to advise appellant to plead guilty of murder in the second degree, the examination of the attorney for the defense shows the following:

"Q. Did the psychiatrists in any manner make any report in which they declared that defendant was sane on the date of the commission of the offense?

A. No, but *there is a report of a psychiatrist,* I cannot recall who he was, it is a report I saw, which, as I said, my colleague Torres González courteously showed to me, *a psychiatrist who was treating defendant at the time of the occurrence of the facts, saying that he was not mentally incompetent.*

Q. You do not know who the doctor is?

A. I cannot remember.

Q. Who ordered that examination?

A. My colleague Roberto Torres González, who was the prosecuting attorney who investigated these cases right after the occurrence.

.     .     .     .     .     .     .     .

Q. Do you know whether at any time, having knowledge that this citizen was entitled to veteran benefits, were any steps taken to submit him to an examination by a doctor of the Veterans' Administration?

A. Yes, upon defendant's insistence I, in turn, insisted that Dr. Señeriz form part of the panel of expert psychiatrists; although said physician is a private-clinic physician he has a contract with the veterans.

Q. I mean immediately after the commission of the offense or immediately after he went to talk with you the first time.

A. No, because when defendant came to see me the first time, if I remember correctly, *several months had already elapsed,*

I should say, *about three or four months after the occurrence of the facts, so that when he came to see me the prosecuting attorney had already procured the services of a psychiatrist immediately after the occurrence of the facts.*

Q. Do you know how long after the investigation made by prosecuting attorney Torres González petitioner was examined by the former's psychiatrist?

A. From the commission of the offense until what examination?

Q. Until the examination ordered by him.

A. As far as I can remember, if I remember correctly, I am speaking from memory, *he was examined by the physician designated by my colleague Torres González.*

. . . . . . . .

Q. Do we have that report at hand?

A. *I saw it about the year 1962, where it may be or who may have it, I do not know.*

. . . . . . . .

Q. Then, you trusted that examination of the prosecuting attorney's physician?

A. *It is not that I trusted it; I requested a psychiatric examination on three occasions; the fact is that said examination was performed on the day of the occurrence of the facts and I took the case several months later,* which might have been two, three, four, I cannot remember, but it was several months later.

. . . . . . . .

A. *My experience has been,* for example, *I am going to cite you the case,* specifically; when I defended *Castañeda* I raised the question of insanity and *the clinical record was presented which was very similar to that of this defendant, a subsequent clinic-mental record and the psychiatrists plainly said in court that they could not tell whether or not at the time Castañeda entered the jewelry shop he was crazy;* and this is one of the cases I can remember, and then I have talked and discussed it with Dr. Señeriz himself, and with Dr. Galíndez, and all of them agree on this point.

Q. As an attorney in this contention, would he be guilty of murder in the first degree?

A. No, if guilty, he would be guilty of manslaughter and possibly of involuntary manslaughter, but what happens is that defendant's theory stands alone against the staff of witnesses for the prosecution, who testified that the facts had occurred in a different manner, that there was no wrestling, and also there was a stab without provocation, that appellant had arrived and had stabbed that person with a knife and had killed him.

Q. And accepting said facts and having a medical record of that nature, from '49 to '63, as an attorney, was it not proper to think that said person was insane at that time?

A. Yes, except that *I, as an attorney, not being a psychiatrist, had to rely on the opinion of the psychiatrists, and the opinion of the psychiatrist who examined him immediately after the occurrence of the facts was that he was not mentally deranged, and the opinion of the expert witnesses later on also established that defendant could stand trial.*" (Italics ours.)

■ In the presence of clear and abundant evidence of the commission of the offense, and the probability of not being able to adduce robust and credible evidence in the sense that appellant was mentally deranged at the time of the commission of the offense, and therefore, considering the risk that appellant might be found guilty of murder in the first degree, we cannot conclude that his assistance of counsel was inadequate in presenting the plea of guilty, which appellant accepted and ratified at the hearing of the trial, when the medical experts, after examining him several times, certified that the symptoms of his previous mental condition had disappeared and that appellant could stand trial.

■ In the light of the circumstances previously recited, we cannot conclude that in this case there was a fundamental negation of justice. The constitutional right of assistance of counsel which provides defendant a fair trial does not mean that every error of judgment or of strategy of trial tactics, or common error of policy in relation to the applicable law deprives defendant of said constitutional right. The record does not show that the attorney for the defense failed to exert himself to procure evidence as to appellant's

mental condition or to have him examined by a psychiatrist or to procure evidence of other possible defenses of which he might have knowledge, or that in exercising his judgment he did it without being duly informed of the circumstances of the case. *United States* v. *Fay,* 348 F.2d 705, 707 (2d Cir. 1965) ; *Hickock* v. *Crouse,* 334 F.2d 95, 100 (10th Cir. 1964) ; *Brubaker* v. *Dickson,* 310 F.2d 30, 37 (9th Cir. 1962). See also, *Stack* v. *Bomar,* 354 F.2d 200 (6th Cir. 1965).

Therefore, the order of the Superior Court, San Juan Part, entered in this case on August 12, 1964, will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein. Mr. Justice Santana Becerra dissented in a separate opinion in which Mr. Justice Hernández Matos and Mr. Justice Dávila concur.

—O—

Mr. Justice Santana Becerra, with whom Mr. Justice Hernández Matos and Mr. Justice Dávila concur, dissenting.

San Juan, Puerto Rico, June 6, 1968

According to the record of Criminal Case No. G-61-619, of the Superior Court, San Juan Part, for murder, against Rigoberto Molina Santana, there appear the following facts:

(1) On June 8, 1961 information of murder was filed against Molina Santana, because on April 24, 1961, with malice aforethought, a firm and deliberate intent and purpose to kill, showing an abandoned and malignant heart, he caused the death of Guadalupe Cruz Díaz, a human being, with a knife.

(2) On July 19, 1961 Molina Santana appeared for arraignment, assistance of counsel was provided for said act, he pleaded not guilty and requested trial by jury.

(3) On November 22, 1961, through his counsel, Mr. C. H. Juliá, defendant moved for the continuance of the trial

which had been set for the 27th of that month, because Molina Santana was under psychiatric treatment in the Veterans' Administration, and he was not in a condition to appear at the hearing. On this date the trial was continued by reason of nonappearance of the defendant, his arrest was ordered, and the hearing was set for March 12, 1962.

(4) Attached to the record and dated November 29, 1961, there appears a certificate of the Veterans' Administration, addressed to Judge Carreira Más, establishing that Rigoberto Molina Santana was under treatment in the Mental Hygiene Clinic of said institution, as an outpatient.

(5) According to the minutes, on March 12, 1962 and on motion of the defense, the court ordered to summon a panel of medical experts composed of Drs. Señeriz, Valderrábano, and Galíndez, of the Psychiatric Hospital, to appear on March 19, to perform a psychiatric examination on the defendant to determine whether he could stand trial. Appellant did not appear on said date.

(6) On April 2, 1962, the panel of expert psychiatrists met and after examining defendant they reached the conclusion that subsequent successive examinations were necessary to determine his mental condition before going to trial. His confinement in the Psychiatric Hospital was ordered for that purpose.

(7) On April 2, 1962, Drs. Señeriz, Valderrábano, Galíndez, and Tejedor Pascual, determined that after examining the defendant, they reached the conclusion that due to the scarce cooperation of the former and the doubts raised by the exhibition of his symptomatology, they recommended subsequent and successive visits for the purpose of determining with full certainty whether he could stand trial. With a view to this report, on April 9, 1962, the court ordered defendant's confinement in the Psychiatric Hospital, to which he was transferred from the District Jail of San Juan.

(8) On May 3, 1962, the expert psychiatrists concluded that on that day the defendant could stand trial and could answer for the offense or offenses charged against him. The case was set for trial on June 8, 1962, when it was continued for the 12th of the same month.

(9) It appears from the minutes that on June 12, at the request of the defense, Drs. Galíndez, Señeriz, and Tejedor, examined defendant and determined that on that day he could stand trial. Right afterwards, (a) the defendant waived his right to a trial by jury; (b) he was arraigned for felony; (c) the prosecuting attorney asked for leave of the court to reduce the degree of the offense to murder in the second degree; and (d) the degree having been reduced, defendant pleaded guilty. It appears from the minutes that the plea of guilty made by defendant's counsel was ratified by defendant, and the court admitted it because in its opinion it was free and voluntary. The minutes do not show, nor have we a stenographic transcript of the proceedings in case G-61-619, any fact which might reveal what elements the trial court had at that time to reach the conclusion that the right to a trial by jury was waived freely and voluntarily.

(10) On June 18, 1962, Molina Santana was ordered to serve from 10 to 15 years in the penitentiary in the case of murder, and six months in jail in the case for bearing weapons. This is the evidence in the record of the case of murder G-61-619.

On November 18, 1963, after a little over one year had elapsed, Molina Santana filed a petition for habeas corpus in the Superior Court, San Juan Part, and alleged (1) that he was illegally deprived of his liberty because he did not have adequate assistance of counsel in violation of the due process of law, and (2) that the court accepted the plea of guilty, knowingly or by mistake, that the same was not made "intelligently, since defendant was not in a condition to make an intelligent plea of guilty since he was suffering a mental

disorder," and that said plea of guilty did not have any legal validity whatsoever.

After the writ was issued and the evidence was heard, the Superior Court, San Juan Part, set aside the writ on the following findings:

### "FINDINGS OF FACTS

On June 12, 1962 and before Baldomero Freyre, petitioner appeared for the hearing on the merits of cases G-61-619 and M-61-823, against petitioner herein, for the offenses of murder and carrying of weapons. Defendant was represented by Mr. Charles H. Juliá. A panel of medical experts determined that defendant could stand trial. After this determination, defendant, represented by Mr. Juliá, pleaded guilty of the offenses of murder in the second degree and carrying of weapons. Subsequent to this act defendant was sentenced.

### CONCLUSIONS OF LAW

Petitioner had adequate assistance of counsel in the afore-mentioned cases. He was mentally competent when he pleaded guilty. His imprisonment is, therefore, lawful.

The petition for Habeas Corpus is denied.

Let it be notified.

Issued in San Juan, Puerto Rico, August 12, 1964."

This petition is Molina Santana's appeal from the foregoing decision.

Before proceeding further, it is proper to note that the trial court limited its previous pronouncement to the fact that petitioner had had adequate assistance of counsel and that he was mentally competent when he pleaded guilty. Obviously, the court referred to the fact that the expert psychiatrists had determined that on that day appellant could stand trial.

The analysis of the evidence as a whole and the other attendant circumstances constrain me to conclude that the question to be decided, in the light of said evidence and

circumstances, delved more deeply into the fundamental aspect of the due process and the guarantees of the citizen, of whether said plea of guilty was free and spontaneous and was not due to other considerations which could have influenced the mind, unquestionably deranged, of the defendant. There is a difference between the fact that the expert witnesses stated that that day defendant could stand trial— if he was in a condition in which he could rationally understand his prosecution—and the other fact of waiving, with the proper understanding and without pressure or influence of any kind whatsoever, an extremely important constitutional right such as the adversary proceeding, which mechanism, aided by the confrontation of witnesses and opportunity of cross-examination, constitutes now more than ever, as has been said, and even when the absolute truth is not disclosed, the best way to elucidate the truth of certain facts in furtherance of justice.

The record, previous to said plea of guilty, as it appears from the transcript of the oral evidence, in addition to the evidence in the record to which I have referred at the beginning, is as follows:

According to the medical records in the Veterans' Administration, petitioner was confined in Clínica Juliá in 1949 and was pensioned due to a condition of schizophrenia connected with his military service. He was compensated on a basis of 100% mental disability. In 1960 he received outpatient treatment in the neuropsychic clinic of the Administration. From March 7 to 11, 1961 he was confined in Clínica Juliá due to his schizophrenic condition.[1]

In 1955 and 1956 he had been submitted to psychiatric examinations, resulting in a diagnosis of "psychotic reaction, psychotic personality."

---

[1] The episode which could have resulted in said confinement was proximate to the commission of the offense on April 24, 1961.

The examination of May 9, 1963 (subsequent to the criminal acts and subsequent to the proceeding) showed a schizophrenic reaction.[2]

Petitioner testified that he has been receiving a 100% veterans pension for a long time and it has never been withdrawn. He has a guardian. When asked why he had pleaded guilty, he answered:

(R. p. 15)

"Because my attorney told me that I was going to be condemned to life imprisonment and Dr. Galíndez told me to mind him or I *would rot* if I were pronounced crazy.

Q. Were you afraid?

A. Sure."

Petitioner admitted he was examined that day to determine whether he could stand trial. He did not remember how long the examination lasted; it was performed in the prison cell and Dr. Galíndez gave him a pill.[3]

Petitioner testified that on his counselor's advice he had accepted to plead guilty "in the manner he told me I accepted it, or . . . ." (R. p. 38.)

Further on, when examined by the prosecuting attorney (R. p. 46):

"Q. And whoever were there that day and had examined you on that day, did they again report to the court that you could stand trial?

A. Yes, sir, they said so.

Q. And that was what you understood before pleading guilty?

A. Yes, naturally, I was informed.

Q. That is, that that day you could tell between right and wrong for all purposes, and you could help your attorney?

A. I was prepared in advance with what my attorney had told me, I knew I was in for it.

---

[2] "Catatonic."

[3] The minutes of the day of the trial state that Dr. Galíndez examined the petitioner and found that he could stand trial. The parties *stipulated* that that would be the opinion of Drs. Señeriz and Tejedor.

Q. Did you talk to him?

A. Not I, but I remember that my counsel did.

Q. I ask you whether you did not say here this morning that psychiatrist Galíndez, what did psychiatrist Galíndez tell you?

A. To mind my counsel's advice and to accept ten to fifteen years, which was better than to be confined in the insane asylum for life."

(R. p. 48.)

(Prosecuting Attorney)

"Q. And let us come now to those examinations, when they examined you, did the psychiatrists ask you anything?

A. Well, questions, but I cannot remember what they asked me.

Prosecuting Attorney:

Let him indicate that fact.

Witness:

A. Judge, first they asked me what date is today, who is the president of the United States, who is the governor of Puerto Rico; well, sure I know Luis Muñoz Marín.

Q. Then, as to the day of the facts, the day you pleaded guilty, you pleaded guilty, first, because according to you they promised you from 10 to 15 years, and second, because you thought you were guilty?

A. No, sir, I never thought I was guilty of the crime committed, not even now.

Q. Then, you do not think you are guilty of the crime committed?

A. I do not deny I committed it, but I am not guilty of my acts.

Q. You do not deny you committed it, but you say you are not guilty?

A. No.

Q. I want to know how you harmonize your statements that you committed the crime and that you did not commit it.[4]

A. I can inform the court how I committed it; I left Clínica Juliá on my own account and as soon as I reached my house I started to see animals behind me.[5]

Q. Was it not a woman?

A. That explains it and I heard her saying dead or alive, and then, first, she hit me and I fired and when I awoke in the house I was told that I had killed a person, but I did not realize it; it was not premeditated, I have never killed, except in the army, because it was my duty.

Q. And you were carrying a knife?

A. My friend took it from a counter.

Q. How do you know he took the knife from the counter?

A. The patient has conscious lapses when he can remember.

.     .     .     .     .     .     .     .

Q. You complain that you were sentenced to serve from 10 to 15 years, not that you were sentenced to pay 900 dollars?

A. Actually, I did not commit the crime nor premeditated it, because as a veteran I fought three years in the battlefield; it should be taken into consideration that Castañeda was sentenced to serve from 10 to 15 years concurrently, and I, who am sick, should be sentenced to serve less than that; I asked the attorney to fight the case . . . the doctor tells me to mind the advice or you will rot in the psychiatric hospital . . . I told the doctor that if I were sentenced to life imprisonment, I would commit suicide."

.     .     .     .     .     .     .     .

(Defense) (R. p. 54)

"Q. And you killed a person who was a friend of yours.

A. Friend of mine who never did wrong, I am very sorry."

Mr. Juliá testified as to his professional action in this

---

[4] On this apparent contradiction precisely relies the crucial point under consideration, based on the lack of criminal responsibility by reason of the mental irresponsibility.

[5] The medical records show that petitioner was confined in Clínica Juliá from March 7 to 11, 1961, without stating how he left the hospital. Petitioner says that he left on his own account. The crime was committed on April 24, a short time later.

case. He took the case many months after the occurrence of the facts, for which reason he could not order a psychiatric examination of petitioner's mental condition immediately after the crime was committed, which would be more reliable on account of its proximity to the crime. Petitioner offered a version of the occurrence of the facts and the attorney knew that the witnesses for the prosecution were going to offer a different version.

The record shows that Mr. Juliá was always very diligent in ascertaining that petitioner would not be prosecuted unless he was under the proper mental condition. He requested several psychiatric examinations. However, the report of the latter did not determine whether or not at the time of the commission of the offense, the petitioner was criminally liable. It did not decide the *defense* of insanity on the merits.

Dr. Galíndez, brought by the prosecuting attorney, testified that in April 1962 he examined petitioner and again on the day of the trial, for the purpose of determining his mental condition to stand trial. It was concluded that on the day of the trial he could be prosecuted.

Upon questions by petitioner he said that he reached the conclusion that on the date of the trial, June 12, there was a "schizophrenic" reaction, paranoid in the remission of symptoms. He explained that by remission of symptoms he meant that certain symptoms present in the patient when he was first examined on April 2, had disappeared. Petitioner's mental condition was determined on both occasions, April 2 and June 12, 1962, for the purpose of deciding whether or not he could stand trial, not to determine his condition when he committed the crime more than a year before.

Dr. Galíndez testified that undoubtedly petitioner could be in a doubtful mental condition when the facts occurred; that in order to answer with more certainty he had to rely on a psychiatric examination more proximate to same; he could say that he might or might not be insane. He could

not make said determination going back to 1961, although the physician remarked that petitioner's record showed that he had been insane and he imagined there existed a record of·the physicians who had examined him.

It is evident that Dr. Galíndez limited his report to the condition as to whether or not he could stand trial, without embracing the aspect of the *insanity as defense*. However, the stenographic record leaves the strong impression in the proceedings at the trial court that because he was pronounced mentally competent to stand trial, a defense of insanity would be weakened or prove unsuccessful.

According· to the record, the testimony as to the plea of insanity partially copied in the majority opinion, *ante*, pages 194 to 196, closes as follows: (R. p. 21)

"Q.—Then, to discard the *defense of insanity*, you took into consideration two factors, the sworn statements of two witnesses that the prosecuting attorney had the courtesy to show you[6] and the testimony of the psychiatrist who examined him shortly after the occurrence of the facts?[7]

"A.—As my colleague may see from the record, I did not discard the theory of insanity, I again raised the question of insanity, I did not discard it, the psychiatrists discarded it. *If a person can stand trial, that indicates that the question of insanity cannot be raised because the theory is that he can distinguish right from wrong.*

"Q.—Then, you made a valuation relying on the fact that *when the psychiatrists said that the man could stand trial, that discarded the theory of insanity?*

"A.—*In my opinion, yes.*

"Q.—That is all, Your Honor." (Italics ours.)

The petition for habeas corpus was based on the facts that petitioner was not duly represented and that his mental con-

---

[6] They were not expert testimony.

[7] This examination, which it is said was performed at the request of the prosecuting attorney, was not brought by him at the hearing for habeas corpus, although it was requested.

dition rendered him unable to waive his constitutional rights intelligently.

A petition for habeas corpus, after the writ is issued, ceases to be an ordinary proceeding between two parties. It becomes an inquiry which the State itself initiates to examine its own actions in depriving a citizen of his liberty. In such cases the courts are not bound or limited by the specific allegations of a petitioner.

I am firmly convinced that this is not a case of lack of defense or of the attorney's noncompliance with his duty to his client. No evidence is necessary, since I know from my own knowledge of the ability, experience, and competence of Mr. Juliá in the practice of his profession, as well as of his unquestionable sense of dedication to the causes he defends. Under the circumstances before him he used his honest and best judgment as to the manner of protecting his client in the light of the means available to him.

But this, however, the counselor's strategy or his view as to the available evidence, is not the fundamental problem presented by this petition. The basic problem is whether the plea of guilty was completely free and voluntary, solely prompted by a conscientious desire to confess judicially the guilt, without petitioner's deranged mind being influenced when he followed his attorney's advice at that time, by other considerations which might inspire fear, dread, or convenience.

The record convinces me that it was not a pure act of conscience. Petitioner's testimony in the sense that Dr. Galíndez warned him to mind his counsel's advice, that it was better to be found guilty than to be pronounced crazy, since then he "would rot" in a psychiatric hospital, was not in any manner contradicted. The prosecuting attorney called Dr. Galíndez to the witness stand and the latter had the opportunity to contradict petitioner on that point. He did not.

On the other hand, the fact that a psychiatric examination was not performed proximate to the commission of the crime, did not mortally affect the *defense* of insanity. As Dr. Galíndez noted, petitioner had an extensive record as a mental patient, starting in 1949 with a diagnosis of schizophrenia, ratified in 1955 and 1956, a psychopath, and in March 1961, shortly before the killing. Even after he was sentenced in 1963, he continued to be a psychopath. That extensive record of psychosis which appeared in the records of the Veterans' Administration and in Clínica Juliá, together with other circumstances, like the apparent absence of motive to kill, could be sufficient ground for a jury, in an adversative trial, to pass on Molina's criminal liability or his lack of liability.

I only point out the fact that a *defense* of insanity was not inexistent for petitioner. I am not going to consider, as in the majority opinion, the doctrine and methods to be followed when said defense is raised. In this petition it is not necessary to enter into that field, since having pleaded guilty, the petitioner missed the opportunity to raise the same. This was a plea of guilty agreed upon, undoubtedly, on the basis of what they believed was the best strategy of defense, on the fact that the reduction of the degree of the offense and the threat produced by the "rotting" in the psychiatric hospital, were factors which influenced petitioner's weak and insane mind.

Under the remedial action now provided by Rule 192.1 of the Rules of Criminal Procedure, adopted pursuant to Act No. 99 of June 2, 1967, it is my opinion that the plea of guilty should be set aside, as well as the sentence, and Molina Santana should be granted a plenary suit.

If he did not incur criminal liability in killing, the correct sense of justice tells me that neither he nor his children should bear the disgrace of a criminal conviction, even though he spend his life in a psychiatric hospital, or

until he is cured, if he actually killed without liability.

The statement that in this case there was no substantial negation of justice seems unreal to me where, under the circumstances of this case, a mentally deranged citizen has been deprived of the highest value of criminal justice, the plenary trial on the merits of his guilt or innocence.

